Lavelle N. HAWKINS, Appellant,

v.

UNITED STATES, Appellee.

No. 89–1517.

District of Columbia Court of Appeals.

Argued April 11, 1991.

Decided April 3, 1992.

Anthony S. Haughton, Public Defender Service, appointed by the court, with whom James Klein and Elizabeth G. Taylor, were on the brief, for appellant.

Robert J. Spagnoletti, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, Thomas J. Tourish, Jr., and Oliver W. McDaniel, Asst. U.S. Attys., were on the brief, for appellee.

Before ROGERS, Chief Judge, and TERRY, Associate Judge, and BELSON,* Senior Judge.

BELSON, Senior Judge:

A jury found appellant Lavelle N. Hawkins not guilty of assault with intent to murder while armed,[1] D.C.Code §§ 22–503, –3202 (1989), but guilty of the lesser included offense of assault with a dangerous weapon, id. § 22–502. On appeal, Hawkins contends that the trial judge abused his discretion in denying a motion

for mistrial after the prosecutor placed a prejudicial allegation before the jury without a good faith basis while examining a government witness, and that the prosecutor, under the guise of impeaching a government witness, improperly substituted the witness' grand jury testimony for the far less inculpatory testimony the witness gave at trial. We affirm.

I.

In the early morning of Saturday, June 11, 1988, Mr. Willis Gooding, also known as "Puffy," began his trip to visit a friend at the Lorton Correctional Facility. Mr. Gooding was dressed as a female. While Gooding waited at a bus stop on Benning Road, Northeast, Washington, D.C., appellant Hawkins along with three other individuals drove by in a blue convertible rental car.[2] Gooding, who knew Hawkins from the neighborhood, asked for a ride downtown to board a transfer bus to Lorton. Gooding got in the back seat of the car. Hawkins, instead of driving downtown, drove around the corner to Phelps Vocational School. No one discussed why they were going to Phelps.

Upon arrival at the school, everyone got out of the car. Gooding and co-defendant Revels proceeded to go down a stairway which lead to one of the school's buildings. Gooding then performed a sexual act with Revels for which Gooding asked and received ten dollars from Revels. Gooding testified that he had performed this same sexual act with both Hawkins and Revels at least twice in the preceding year.

As Gooding approached the top of the steps, Hawkins asked to have the same sexual act performed on him. Gooding refused because he was concerned that he would miss the bus to the Lorton Correctional Facility. Hawkins then asked Revels for a gun, took it, pointed it at Gooding,

---

* Judge Belson was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on July 24, 1991.

1. Appellant was charged also with one count of assault with intent to kill while armed, D.C.Code §§ 22–501, –3202 (1989); one count of carrying a pistol without a license, id. § 22–3204; and

one count of carrying a dangerous weapon, id. § 22–3204. During the course of the trial, however, the trial judge dismissed these counts.

2. Accompanying appellant were co-defendants James Eric Revels, Stephen Weaver, and Perry Edon.

and pulled the trigger. The gun clicked but did not fire. Hawkins pulled the trigger a second time; this time the gun fired and the bullet entered Gooding's left nostril, causing serious injury.

Hawkins and his three companions jumped into the rental car, which was parked a few feet from the steps. Gooding leaned over toward the car but Hawkins drove away. Gooding then proceeded to walk from behind the school where other persons came to his assistance. Investigation by the Metropolitan Police led to the arrest and indictment of Hawkins and Revels.

At trial, the prosecutor called as a witness Stephen Weaver, one of Hawkins' companions in the rental car the morning of the incident. The prosecutor sought to have Weaver declared a hostile witness on the ground that it had been necessary to have him arrested to ensure his presence at trial. The trial judge reserved his determination regarding Weaver's hostility.[3]

Weaver had testified before the grand jury prior to Hawkins' indictment. Although his testimony at trial corresponded with his grand jury testimony in some respects, his responses to certain questions gave a version of the incident that differed sharply from his previous testimony.

Weaver testified at trial that he, along with Hawkins and Hawkins' co-defendant, James Eric Revels, and Perry Edon, had been riding around in a rental car all night. Weaver then stated that he knew someone named "Puffy" and that the first time they saw him the following morning was behind Phelps Vocational School. The prosecutor claimed surprise. Hawkins' counsel initially asserted that there was lack of foundation, but after a colloquy with the judge stated:

MS. GRAY: If the Court is inclined to allow him to do this I would ask that he

now allow him to continue in a leading manner with all questions.

The trial judge responded that it was necessary to proceed question-by-question in "a surprise scenario" and then permitted the prosecutor to impeach Weaver with his grand jury testimony in which he stated that they first saw Gooding on Benning Road near a barber shop.

Weaver then stated that they drove into the driveway of Phelps school and saw "Puffy" there with a man. The prosecutor claimed surprise for a second time and impeached Weaver with his grand jury testimony that he and his friends were at the barber shop when they saw "Puffy" across the street and took him in their car behind Phelps school. At the time of this impeachment, counsel for Hawkins was granted a continuing objection which, she later clarified, was based upon lack of foundation and materiality.

The third claim of surprise arose when the prosecutor asked Weaver whether he had gone near any of the buildings at Phelps. Weaver replied that no one got out of the car. The trial judge viewed the prosecutor's assertion of surprise as legitimate and permitted him to impeach Weaver's trial testimony with his grand jury testimony. During a bench conference it was agreed upon by all parties that the prosecutor would impeach Weaver with his grand jury testimony on this point.[4] The following exchange then took place between the prosecutor and Weaver:

Q. Mr. Weaver, did there come a time when everyone got out of the car?

A. N[o].

Q. And after everyone got out of the car did there come a time when Erick [sic] Revels and Puffy engaged in some form of a sex act?

[Q]. And did that act take place close to or nearby one of the buildings in Phelps' complex?

---

**3.** During the course of Weaver's testimony, the prosecutor once again asserted that there was hostility on Weaver's part and renewed his motion to have him declared a hostile witness. The trial judge, however, chose to allow the prosecutor to cross-examine Weaver under the theory of surprise in accordance with D.C.Code

§ 14–102, *infra* note 6, rather than declare Weaver a hostile witness.

**4.** Although counsel for Hawkins objected to the reading of the first five lines of the grand jury transcript that the prosecutor used, those five lines added nothing prejudicial to Hawkins.

A. The first question you asked me I answered no.

Q. I'm asking you this specific question?

A. No.

Q. And did there come a time when Mr. Hawkins shot Puffy?

A. No.

At this point Hawkins' counsel objected and moved for a mistrial. During a bench conference, the trial judge criticized government counsel, pointing out that Weaver never testified before the grand jury that he saw any particular person fire the shot and that "we're in a context where there is an implication by the procedure we've been following that the questions that you are asking are supported by Grand Jury testimony." The prosecutor acknowledged that the question was inartfully phrased and that he could have asked Weaver whether he had heard the shot. The trial judge pointed out, in response to an argument by counsel for Hawkins, that witnesses do not "belong" to any party and that "we are in the context of a legitimate assertion of surprise," a statement with which counsel for Hawkins agreed. The judge denied a mistrial, but instructed the jurors that questions by the attorneys are not evidence and that in reaching their verdict they should consider only the evidence.

Weaver then testified that while at Phelps he heard a gunshot and reiterated that he was not near the building on the grounds of Phelps. The prosecutor then impeached Weaver with the following grand jury testimony:

He went around there and Erick gave him the money. Him and her and Eric went down the steps and we was at the top of the step laughing. And then Eric came up saying give me $5 back, I was playing, I only had $15. Give me $5 back. She said, "Stop playing, Derrick [sic], I got to go." And then Lavelle was in the corner peeing and we came and

Lavelle was finished and went back over there saying, "Go ahead, Puffy, just give it back to him." And Puffy said, "Stop playing, Eric." Eric said, "I ain't playing. You think I'm playing." And that's when, pow, the gun went off and everybody jumped in the car and left.

The prosecutor continued to ask Weaver a series of questions about the presence of a weapon or weapons in the car. He then asked leave at a bench conference to impeach Weaver on that point. The trial judge reminded the prosecutor that Weaver's grand jury testimony could be used only to impeach him, not as substantive evidence, and stated "we've got to put a stop to it sooner or later. And I think we're at least at sooner and probably at later right now."

Following Weaver's testimony and at the close of the government's case, the trial judge instructed the jury on the limited use of the impeachment testimony, emphasizing that it could not be considered as substantive evidence.

## II.

Appellant Hawkins contends that the prosecutor knowingly and impermissibly placed a prejudicial allegation before the jury in that he lacked a good faith foundation for asking government witness Stephen Weaver whether Hawkins had shot Gooding when the prosecutor knew that Weaver had not testified before the grand jury that he had seen the shooting. Hawkins further asserts that in this case the prosecutor's "misconduct"[5] was more egregious because it occurred during the course of an impeachment process in which he used Weaver's grand jury testimony to impeach his trial testimony with the result that it implied to the jury that Hawkins had so testified before the grand jury.

■ When reviewing allegations of prosecutorial "misconduct," it first must be determined whether the alleged comment or question was impermissible. Then, view-

---

5. In *Harris v. United States*, 602 A.2d 154, 158–159 and n. 5 (D.C.1992) (en banc), we observed that the term "misconduct" is an unduly harsh description for many of the unintentional or

relatively minor lapses of counsel that occur during trial, and suggested the use of the term "impropriety." *See McGrier v. United States*, 597 A.2d 36, 40–41 (D.C.1991).

ing the comment or question in context, consideration must be given to the gravity of the challenged conduct along with its "direct relationship to the issue of guilt, the effect of specific corrective instructions by the trial court, and the strength of the government's case." *Hammill v. United States*, 498 A.2d 551, 554 (D.C.1985).

To warrant reversal, the challenged conduct must bring about substantial prejudice. *Id.* at 554; *accord Dyson v. United States*, 418 A.2d 127, 132 (D.C. 1980). Because Hawkins preserved his objection to the prosecutor's question, substantial prejudice is determined by "whether we can say, 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by error.'" *Dyson*, 418 A.2d at 132 (citations omitted).

In the District of Columbia, a party may be permitted to impeach its own witness if the court is satisfied that the party producing the witness has been surprised by the witness' testimony, D.C.Code § 14–102 (1989), and can demonstrate affirmative damage to its case.[6] *See Jefferson v. United States*, 558 A.2d 298, 301 (D.C.), *modified*, 571 A.2d 178 (D.C.1989), *cert. denied*, 493 U.S. 1032, 110 S.Ct. 748, 107 L.Ed.2d 765 (1990).

Here, Hawkins does not contest the prosecutor's initial claim of surprise. He does, however, argue that the prosecutor lacked a factual predicate in Weaver's grand jury testimony for the question whether there came a time when Hawkins shot Gooding.

It is true that the question whether Hawkins shot Gooding, when viewed in the context of the prosecutor's use of Weaver's grand jury testimony to impeach his trial testimony on a series of matters, could have suggested to the jury that Weaver

had stated to the grand jury that Hawkins shot Gooding, or even that he had seen Hawkins shoot Gooding. As the trial court stated, "we're in a context where there is an implication by the procedure we've been following that the questions that you are asking are supported by Grand Jury testimony."

Nevertheless, Weaver's grand jury testimony demonstrates that the prosecutor had an adequate factual basis for asking Weaver whether Hawkins had shot Gooding. Before the grand jury, Weaver did deny seeing and knowing who fired the shot. Weaver also testified, however, that after the gun fired he heard Gooding say to Hawkins "why you do that? why you do that?" Weaver further stated that as the four men returned to the car, Gooding was standing up and said "Lavelle, why you do that?"

These statements by Weaver to the grand jury could have formed the basis for the prosecutor's belief that Weaver knew that Hawkins shot Gooding and thus constituted an adequate factual predicate for the prosecutor's question at trial. *See Scull v. United States*, 564 A.2d 1161, 1164 (D.C.1989) (counsel must have sufficient good-faith basis or well-reasoned suspicion for proposed cross-examination).

This case is distinguishable from *United States v. Brown*, 519 F.2d 1368 (6th Cir. 1975), upon which Hawkins relies. Brown was convicted of aiding and assisting in the escape of a federal prisoner. *Id.* at 1369. The government asked its witness whether he had testified in another court proceeding that Brown had participated in the prison escape by "using hacksaw blades to cut through the bars and by providing the hairdressing" used to facilitate passage through the remaining bars. *Id.* at 1370. The court found that the United States Attorney engaged in highly prejudicial con-

6. D.C.Code § 14–102 (1989) provides:
 When the court is satisfied that the party producing a witness has been taken by surprise by the testimony of the witness, it may allow the party to prove, for the purpose only of affecting the credibility of the witness, that the witness has made to the party or to his attorney statements substantially variant from his sworn testimony about material facts in the cause. Before such proof is given, the circumstances of the supposed statement sufficient to designate the particular occasion must be mentioned to the witness, and he must be asked whether or not he made the statements and if so allowed to explain them.

duct by asking a question which he knew lacked a factual predicate; on appeal, the government conceded "that the records of the trial concerned do not provide any basis for the United States Attorney's questions." *Id.*

The situation presented in this case, however, is not equivalent to that in *Brown.* Here, the prosecutor did not place a prejudicial allegation "before [the] jury by dint of cross-examination without being prepared to prove [it]." *Id.* Sufficient support existed in Weaver's grand jury testimony for the prosecutor's question at trial. The trial judge perceived, however, on the basis of the procedure being followed in the examination of Weaver that the trial jury was given the impression that Weaver had flatly stated to the grand jury that Hawkins had shot Puffy, and we cannot disagree with that perception. To this extent, therefore, the jury was misled by the prosecutor's questions. The question, however, was not entirely lacking a good faith basis and, moreover, the immediate curative instruction given by the trial judge to the jury [7] was more thorough than the one administered in *Brown* which instructed the jury only to disregard the witness' denials but failed to tell the jury to disregard the question by the United States Attorney. *See id.* Accordingly, we conclude that any improper conduct on the part of the prosecutor was cured by the trial judge's handling of the matter.

It follows that the trial judge did not abuse his discretion in denying Hawkins' motion for a mistrial as the situation presented here failed to amount to an "extreme circumstance[ ] threatening a miscarriage of justice." *Bliss v. United States,* 445 A.2d 625, 634 (D.C.), *modified,* 452 A.2d 172 (D.C.1982), *cert. denied,* 459 U.S. 1117, 103 S.Ct. 756, 74 L.Ed.2d 972 (1983).

### III.

Turning to the principal remaining issue, Hawkins contends that the prosecutor went beyond the bounds of claiming surprise to impeach Weaver's testimony because the prosecutor, in bad faith, questioned Weaver's trial testimony for the sole purpose of placing before the jury his grand jury testimony, with the possible result that the jury would consider it as substantive evidence of the truth. Hawkins also contends that after the prosecutor's first claim of surprise, he could not legitimately claim surprise throughout the remainder of Weaver's trial testimony. We disagree.

■ It is well settled in this jurisdiction that a party may impeach its own witness only if it has been taken by surprise by the witness' testimony and can demonstrate affirmative damage to its case. D.C.Code § 14–102, *supra* note 6; *accord Jefferson, supra,* 558 A.2d at 301; *Price v. United States,* 545 A.2d 1219, 1224 (D.C.1988); *Fletcher v. United States,* 524 A.2d 40, 43–44 (D.C.1987). The assertion of surprise must be made in good faith, *Parker v. United States,* 363 A.2d 975, 977 (D.C. 1976), and affirmative damage is sustained when the witness' testimony has tended to injure or destroy the party's case. *Jefferson, supra,* 558 A.2d at 301. If no prejudice to the party is shown, there is no need for impeachment to neutralize the testimony. *Scott v. United States,* 412 A.2d 364, 368 (D.C.1980); *Byrd v. District of Columbia,* 43 A.2d 46, 48 (D.C.1945).

■ A witness' prior statements are admissible only to show that the witness is unbelievable. *Scott, supra,* 412 A.2d at 367. The statements "can be used only to neutralize affirmative harm, and not 'to supply the anticipated testimony.'" *Jefferson, supra,* 558 A.2d at 301 (quoting *Scott, supra,* 412 A.2d at 368 (quoting in turn *Young v. United States,* 97 F.2d 200 (5th Cir.1938))). "[P]rior inconsistent statements of a witness are admissible for purposes of impeachment only and are not admissible as proof of the matters contained therein." *Stewart v. United States,* 490 A.2d 619, 625 (D.C.1985).

---

7. The trial judge stated:
 The objection is sustained as to the last question by Mr. McDaniel. Let me make one thing clear. I told you to reach your verdict on the evidence in the case. And I told you what evidence is. Questions by lawyers are not evidence. That's not part of the evidence in the case. All right.

■ The trial court exercises broad discretion in determining whether a party can impeach its own witness, and this court will disturb a trial court's finding of surprise only if the ruling is without any rational basis, i.e., a very deferential standard of abuse of discretion. *Stewart, supra,* 490 A.2d at 624–25; *Parker, supra,* 363 A.2d at 977.

Here the trial judge demonstrated his awareness of the limitations that must be placed on impeachment by prior inconsistent statements. He painstakingly monitored the prosecutor's examination of the government's witness, Weaver, and reminded counsel that a party cannot put "somebody ... on the [witness] stand just to be cross examined." Indeed, counsel for Hawkins acknowledged that the trial judge was dealing with a legitimate claim of surprise. There was no assertion by Hawkins' counsel that the procedure being followed permitted substitution of grand jury testimony. When the prosecutor had completed most of his series of impeachments with prior grand jury testimony, the judge corrected the statement of Hawkins' counsel that the witness Weaver "belongs" to the government by saying:

THE COURT: No, witnesses don't belong to anybody and we are in the context of a legitimate assertion of surprise.

Counsel for Hawkins replied:

MS. GRAY: I understand that. I'm not—other than my continuing objection to the predicate foundation and materiality, I'm not raising any questions with regard to that, Your Honor.

Thus Hawkins did not make in the trial court the broad assertion he argues here that the trial court's handling of the impeachment issue permitted the government to substitute Weaver's grand jury testimony for his trial testimony. We therefore review the point by applying the plain error standard, *Watts v. United States,* 362 A.2d 706, 709 (D.C.1976) (en banc), instead of merely determining whether any error was harmless. The standard used, however, is not determinative, as we are satisfied in any event that the trial court did not err in its handling of the government's examination of Weaver.

■ We observe first that the prosecutor was not precluded from making a successful claim of surprise by the fact that he was aware that Weaver would not comply with the government's subpoena and asserted that he would have to be arrested in order to be brought before the court. Weaver's attitude did not put the prosecutor on notice that once he was on the stand he would not testify in accordance with his grand jury testimony, and thus preclude a claim of surprise. Our holding in *Parker, supra,* is conclusive on this point. There, defense counsel informed the court and the prosecutor that the witness would not support the prosecution despite his previous favorable grand jury testimony. 363 A.2d at 977. The judge called the witness to testify out of the presence of the jury, and at that time he did change his testimony from that given before the grand jury. *Id.* The witness also told the court that defense counsel had interviewed him prior to trial with the defendant present, which had frightened him. *Id.* We determined that we could not say that there was no rational basis for the trial court's ruling that the prosecutor had a valid claim of surprise. *Id.*

■ In the case before us, the witness Weaver gave some trial testimony that was helpful to the government, e.g., his testimony put Hawkins on the scene in the company of Revels and two other individuals, as testified by the victim. When the witness gave other testimony at variance with his grand jury testimony, the prosecutor was in a position to claim surprise. "[A] prosecutor [is] entitled to rely on the witness' prior testimony given under oath, under the presumption that the witness understood the ramifications of committing perjury." *Price, supra,* 545 A.2d at 1224 (citing *Parker, supra,* 363 A.2d at 977; *Gordon v. United States,* 466 A.2d 1226, 1229–31 (D.C.1983)).

Hawkins further argues that after the prosecutor's initial claim of surprise, the prosecutor was aware that Weaver "was repudiating his grand jury testimony and

that the risk of a perjury prosecution was not going to deter him from testifying differently in court than he had under oath in the grand jury." We conclude otherwise because a prosecutor is not limited to asserting a single surprise, or specific number of surprises. Moreover, the prosecutor's claim of surprise is not measured from what the prosecutor learned when the witness a few minutes earlier gave an unexpected response, but rather from the prosecutor's reasonable expectations at the time he called the witness to the stand. Therefore, the prosecutor may legitimately claim surprise again several questions after he initially did so. Otherwise, the prosecutor would not have the opportunity to attempt to place before the jury the witness' present testimony about additional aspects of the events at issue without running the risk of being precluded from impeaching the witness if the witness should give testimony at variance with his previous testimony. The trial judge must exercise discretion in determining how far to permit counsel to proceed with such examination, balancing the probative value of the continuing examination against its possible prejudicial effect.

Having found that the trial judge permissibly could have concluded that the prosecutor was legitimately surprised by Weaver's trial testimony, we now review whether the government's case was affirmatively damaged. As noted previously, the government was entitled to rely on the expectation that Weaver would testify consistently with his grand jury testimony. In significant part, Weaver's grand jury testimony corroborated Gooding's version of the events that occurred. Thus, the prosecutor had every right to call Weaver as a witness to corroborate Gooding's testimony. *See Fletcher, supra,* 524 A.2d at 43 (government can call witness to corroborate eyewitness' version of the circumstances). When Weaver contradicted his grand jury testimony, he also contradicted Gooding's trial testimony, thus causing affirmative damage to the government's case, *i.e.,* tending to injure the government's case. *See Jefferson, supra,* 558 A.2d at 301; *Price, supra,* 545 A.2d at

1225. Thus, both prerequisites for a claim of surprise were present, and the decision whether to permit impeachment was within the trial judge's broad discretion.

■ Hawkins also contends that the prosecutor went beyond the justification for impeachment of Weaver by reading far more extensive portions of his grand jury testimony than necessary. It is true that "the scope of impeachment must be limited to evidence which will further that end." *Scott, supra,* 412 A.2d at 368. The scope of impeachment is committed to the sound discretion of the trial judge:

> while there may well be instances where it would be desirable for the trial court to admit only a portion of the impeaching statement, there may also be others where most or all of the specific details of the earlier statement are essential to appraise the contradiction uttered from the witness stand. For this reason ... "the latitude to be allowed in the cross-examination of the witness is within the discretion of the trial justice."

*Wheeler v. United States,* 93 U.S.App.D.C. 159, 166–67, 211 F.2d 19, 26 (1953) (footnote and citations omitted), *cert. denied,* 347 U.S. 1019, 74 S.Ct. 876, 98 L.Ed. 1140 (1954). From our review of the record it is clear that the trial judge carefully monitored the prosecutor's impeachment of Weaver and made his ruling on each successive assertion of surprise after careful consideration of the arguments of counsel. As the trial judge stated when he denied the prosecutor leave to make further use of the grand jury transcript:

> And it seems to me that given the peculiar nature of surprise, impeachment and a continuing denial by a witness and the fact that I'm going to have to tell the jury that [Weaver's grand jury testimony] is only here for their consideration as to whether or not the witness has testified truthfully on the witness stand and it is not substantive evidence in the case, that we've got to put a stop to it sooner or later. And I think we're at least at sooner and probably at later right now.

In short, we find no abuse of discretion by the trial judge in allowing certain portions of the grand jury testimony to be read to the witness to impeach him.[8]

## IV.

 Finally, we do not credit appellant's contention that the prosecutor, during rebuttal closing argument, invited the jury to use Weaver's grand jury testimony as substantive evidence rather than solely for impeachment purposes. The prosecutor stated:

> Again, let's not be manipulative with this evidence. Let's be up front about it. The only evidence we have comes from Mr. Willis Gooding. And he says directly that Mr. Hawkins shot him and Mr. Revels handed him the gun. Mr. Weaver says they were there.
>
> A gun went off and Willis Gooding wound up wounded. He never said who did it. But he said that these people remained in the car. But in light of his Grand Jury testimony the question becomes not whether or not that Grand Jury testimony wipes out Stephen Weaver's testimony, the question becomes whether or not that Grand Jury testimony also has any impact on whether or not you believe Willis Gooding. The question becomes what's the truth.

Hawkins' counsel did not object. A reasonable reading of the prosecutor's argument is that it calls upon the jury to find Weaver an incredible witness, and thus to credit only Gooding's testimony in determining whether Gooding was shot by Hawkins. Such an argument, in our view, was permissible. Certainly, it did not give rise to plain error.

Finding neither error nor abuse of discretion, we order that appellant's conviction be

*Affirmed.*

8. In *Parker, supra,* we pointed out that under Rule 801(d)(1) of the Federal Rules of Evidence, a witness' previous grand jury testimony is not regarded as hearsay if inconsistent with the witness' present testimony, and that pursuant to Rule 607 of those rules, the party calling the witness may use it to impeach the witness. 363 A.2d at 977–78. The Federal Rules of Evidence do not control here, of course, but they suggest that even if the trial judge had abused his discretion in this regard, the result would not have been seriously prejudicial.

ROGERS, Chief Judge, dissenting:

I agree with the majority that the prosecutor had a good faith basis for asking Stephen Weaver whether appellant had shot Willis Gooding, and that the prosecutor was surprised by Weaver's trial testimony. *See* Parts II and III of the majority opinion, *supra,* at 759–760. However, the record makes clear that the grand jury testimony introduced at trial went beyond that necessary to remedy the "affirmative damage" to the government's case from the surprise proffered by the prosecutor, and that appellant made a timely objection. *See Jefferson v. United States,* 558 A.2d 298, 301 (D.C.), citing *Scott v. United States,* 412 A.2d 364, 367–68 (D.C.1980), *modified,* 571 A.2d 178 (D.C.1989) (to delete footnote 5), *cert. denied,* 493 U.S. 1032, 110 S.Ct. 748, 107 L.Ed.2d 765 (1990). Therefore, because the evidence went to the central issue, and the government's evidence was not particularly strong, the error was not harmless. Accordingly, I would remand the case for a new trial.

First, the proper standard of appellate review regarding the scope of impeachment and harmless error is not, as the majority asserts, plain error. *See* majority at 760. *See Mathis v. United States,* 513 A.2d 1344, 1347–48 (D.C.1986). Defense counsel made a sufficiently specific objection to preserve this issue for review: counsel made a continuing objection to the introduction of this evidence on grounds of lack of foundation and materiality, and moved for a mistrial after the prosecutor asked Weaver if appellant shot Gooding. Further, in discussing what portions of the grand jury transcript should be permitted to be read to the jury, defense counsel indicated concern with the scope of impeachment, and suggested specifically that impeachment should be limited to rebutting Weaver's trial testimony that he did not get out of the car or go near the school. Under these circumstances, the trial judge

was clearly alerted to defense objections regarding the scope of impeachment. *See also* note 2, *infra.* The reason for the continuing objection was to limit the amount of grand jury testimony heard by the jury. Accordingly, any error must be assessed under the harmless error standard to determine whether "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Dyson v. United States,* 418 A.2d 127, 132 (D.C.1980).

Second, while the trial judge has discretion in deciding what portions of an impeaching statement may be admitted into evidence, this discretion is limited to admitting "most or all of the specific details of the earlier statement [as] are *essential* to appraise the contradiction uttered from the witness stand." *Wheeler v. United States,* 93 U.S.App.D.C. 159, 166, 211 F.2d 19, 26 (1953) (emphasis added). With respect to impeachment by surprise, "[s]ince the sole justification for impeachment of one's own witness is to remove the damage cause[d] by the surprise testimony, the scope of impeachment must be limited to evidence which will further that end." *Scott, supra,* 412 A.2d at 368.

The grand jury testimony introduced by the prosecutor went beyond that necessary to remedy the damage caused to the government's case by the surprise identified by the prosecutor. The particularly objectionable impeachment occurred after Weaver had testified, contrary to his grand jury testimony, that he had not gone near the buildings at the Phelps Vocational School, but was approximately 300 feet from the school. The prosecutor was then permitted to introduce a portion of Weaver's grand jury testimony (covering eighteen lines of trial transcript) that went beyond testimony that Weaver had gone near

the building; rather, the prosecutor was allowed to introduce grand jury testimony that Weaver observed appellant go down the steps toward Gooding and then heard a gunshot.

The surprise encountered by the prosecutor was that Weaver testified at trial that he was not near the buildings. This damage could have been rectified, as defense counsel suggested to the trial judge, by reading only a portion of the grand jury testimony in which Weaver said that after he, appellant and Gooding arrived at Phelps, appellant and Gooding "went down the steps and we was [sic] at the top of the step laughing."

This is not a case, as in *Wheeler, supra,* 93 U.S.App.D.C. at 166–67, 211 F.2d at 26, where the details regarding the shooting of Gooding were "essential to appraise the contradiction from the witness stand." Instead, such details were entirely irrelevant to the impeachment at issue, namely whether or not Weaver went near Phelps Vocational School.[1] By introducing more testimony than necessary, the government was able to substitute Weaver's grand jury testimony for the testimony Weaver would not give at trial. *See Scott, supra,* 412 A.2d at 368 ("impeachment cannot be allowed as a means 'to supply the anticipated testimony'") (citation omitted). It was, therefore, error for the trial judge to permit the introduction of the grand jury testimony to the extent that he did.

The error was not harmless. *See Dyson, supra,* 418 A.2d at 132. In the portion of the grand jury testimony improperly read to the jury Weaver stated that he observed appellant and Gooding together, and then heard a gunshot. The error, therefore, went to the central issue of whether appellant shot Gooding. The eyewitness testimony against appellant was not strong, the

---

**1.** The trial judge appears to have realized that he allowed too much grand jury testimony to be introduced:

> And it seems to me that given the peculiar nature of surprise, impeachment and a continuing denial by a witness and the fact that I'm going to have to tell the jury that [Weaver's grand jury testimony] is only here for

> their consideration as to whether or not the witness has testified truthfully on the witness stand and it is not substantive evidence in the case, that we've got to put a stop to it sooner or later. And I think that we're at least at sooner and *probably at later* right now (emphasis added).

government's case consisting primarily of Gooding's testimony. Gooding changed his story and was impeached on two occasions; on redirect examination Gooding testified that the shooting was an accident.[2] In addition to changing his story, Gooding was impeached twice with omissions from his grand jury testimony.

Under the circumstances, the limiting instructions to the jury that impeachment testimony should not be considered as substantive evidence, and that questions by counsel are not evidence, were insufficient to dissipate the prejudice. Accordingly, I would remand the case for a new trial.

---

**2.** The prosecutor told the judge that this was at odds with the witness' prior testimony, and he claimed surprise and wanted to impeach Good-ing. The trial judge did not allow the government to impeach Gooding.