Eric L. **WALDRON**, Appellant,

v.

**UNITED STATES**, Appellee.

No. 89–CF–1215.

District of Columbia Court of Appeals.

Argued May 15, 1992.
Decided Sept. 22, 1992.

Mark J. Rochon, Washington, D.C., for appellant.

Edward G. Burley, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher and Thomas C. Black, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before ROGERS, Chief Judge, and TERRY and STEADMAN, Associate Judges.

TERRY, Associate Judge:

This case arose from two incidents in which appellant Waldron and two co-defendants were involved in shooting attacks on a rival drug dealer in an apparent turf battle.[1] A jury acquitted the co-defendants of all charges and found Waldron guilty of assault with a dangerous weapon [2] and carrying a pistol without a license,[3] but only in connection with the first of the two shootings. On appeal Waldron raises two claims of error. First, he argues that the trial court erred in denying his motion to sever the trial of the two incidents. Second, he challenges rulings by the trial court which permitted the government to impeach two of its own witnesses after claiming surprise. With respect to one of the two witnesses, we hold that the court erred in allowing the impeachment and that this error was not harmless. Accordingly, we reverse Waldron's convictions.[4]

I

In the summer of 1988 David Julian was selling crack cocaine in the 1500 block of First Street, S.W. He frequently conducted such sales from an apartment building at 1500 First Street, and his sellers included Pat Washington and her two teenaged daughters, Tracey and Stacey, who also lived in that building. On the afternoon of July 14, Tracey Washington, then nearly eighteen, was approached by Darryl Hines, who said to her, "Tell your Jamaican boy friend [Julian] we are going to get him." [5] Tracey relayed this warning to Julian, who later drove with Tracey's mother, Pat Washington, to suburban Maryland and returned with a .38 caliber pistol.

1. For each incident Waldron was charged, together with Darryl Hines, with armed assault with intent to kill and carrying a pistol without a license. Tyrone Hopkins was also charged with the same offenses, but only in connection with the second shooting. After the parties initially agreed to sever the two incidents, the government moved to rejoin them. The trial court, after a hearing, granted the motion, ruling that severance was not appropriate because evidence of each offense would have been admissible in the trial of the other.

2. D.C.Code § 22–502 (1989).

3. D.C.Code § 22–3204 (1989).

4. Because we reverse the judgment on this ground, we do not reach Waldron's severance argument, which has been made moot in any event by the jury's verdict.

5. Although Julian was known as "Jamaican Dave" because of his Caribbean accent, he was actually from Trinidad. Tracey Washington testified that she and Julian were "close friends," but that they did not have "any kind of romantic relationship."

Later that evening Pat Washington and Julian were walking down First Street when Waldron, standing in the street, yelled an obscene comment to Julian. The two men exchanged hostile words, and then both drew guns and began shooting at each other. Waldron shot at Julian "four or five" times and then turned and ran away, chased by Julian. Close behind them was Darryl Hines, who also fired at Julian. Julian sustained two bullet wounds, and Pat Washington was also wounded when a bullet grazed her leg.

After being released from the hospital, Julian went back to selling cocaine in the 1500 block of First Street. Tracey Washington testified that on August 27 she was in a nearby park when she overheard Tyrone Hopkins say to Waldron, "Come on, man, you know what we got to do." Tracey then left the park, and soon thereafter, while standing on the porch of her apartment building, she heard shots and saw two men, whom she identified as Waldron and Hines, shooting at Julian. She testified that she recognized Waldron because he was wearing the same shirt she had seen on him earlier that evening. Stacey Washington also testified that she saw Waldron shoot at Julian. Julian, who was unarmed, suffered multiple gunshot wounds in the abdomen, neck, and thigh in this second shooting.

## II

Waldron contends that the trial court committed reversible error when it permitted the government to impeach two of its own witnesses, Glennette Williams and Angela Paylor, after claiming surprise. We hold that the trial court erred in both instances because on neither occasion did the "surprise" testimony affirmatively damage the government's case. The government argues that the court did not err,

or, alternatively, that if it did, both errors were harmless. We agree with the government that sustaining the claim of surprise as to Paylor was harmless error. We conclude, however, that Waldron was prejudiced by the impeachment of Williams, and on that ground we reverse his convictions.

■ Our case law interpreting the surprise statute, D.C.Code § 14–102 (1989),[6] makes clear that "a party may impeach its own witness only if it has been taken by surprise by the witness' testimony *and* can demonstrate affirmative damage to its case.... [A]ffirmative damage is sustained when the witness' testimony has tended to injure or destroy the party's case." *Hawkins v. United States*, 606 A.2d 753, 758 (D.C.1992) (citations omitted and emphasis added). Prior statements by the witness "can be used only to neutralize affirmative harm, and not 'to supply the anticipated testimony.'" *Jefferson v. United States*, 558 A.2d 298, 301 (citations omitted), *modified on other grounds*, 571 A.2d 178 (D.C.1989), *cert. denied*, 493 U.S. 1032, 110 S.Ct. 748, 107 L.Ed.2d 765 (1990). "The trial court exercises broad discretion in determining whether a party can impeach its own witness, and this court will disturb a trial court's finding of surprise only if the ruling is without any rational basis, i.e., a very deferential standard of abuse of discretion." *Hawkins v. United States, supra*, 606 A.2d at 759 (citations omitted).

The first claim of surprise came during Glennette Williams' testimony about the July shooting. Asked by the prosecutor whether Waldron or Julian fired first, Williams responded that she did not know. At a bench conference which followed, the prosecutor told the court that this testimony was a surprise because she had previously spoken with Williams on several occasions, and Williams had always said that

---

**6.** D.C.Code § 14–102 provides:

When the court is satisfied that the party producing a witness has been taken by surprise by the testimony of the witness, it may allow the party to prove, for the purpose only of affecting the credibility of the witness, that the witness has made to the party or to his attorney statements substantially variant from

his sworn testimony about material facts in the cause. Before such proof is given, the circumstances of the supposed statement sufficient to designate the particular occasion must be mentioned to the witness, and he must be asked whether or not he made the statements and if so allowed to explain them.

she saw Waldron shoot first.[7] Over the objection of Waldron's counsel, the court ruled that Williams' testimony constituted affirmative harm to the government's case because it went "to the heart of whether or not [Waldron] was acting in self-defense."

When direct examination resumed, the prosecutor asked the following questions:

Q. As to the question, Miss Williams, of who shot first, you say you don't recall now?

A. Well, really it seemed like Eric [Waldron] pulled his first, though. It really seemed like Eric pulled his first.

Q. Are you saying pulled it from wherever it was or are you saying shot first?

A. Pulled it out first.

Q. Okay. Where did he pull it from?

A. Out [of] his pants.

Q. So he pulled his gun before David [Julian] pulled his; is that right?

A. ... Yes.

Q. And who—do you know who shot first?

A. No, I do not.

A moment later the prosecutor asked Williams whether she recalled being summoned, one week earlier, to attend a witness conference at the prosecutor's office. Williams said that she did, and the questioning continued:

Q. And do you remember saying at that time that Eric shot first, that's what you saw?

A. I probably—yeah, I said it.

Q. Was that what you saw?

A. I said that, but now that I'm thinking about it, I can't really say who shot the gun first, because both of them had their guns out.

▪ Waldron argues now, as he did at trial, that Williams did not damage the government's case with her surprise testimony, but merely "failed to go as far as the government hoped" by "express[ing] lack of knowledge about a specific fact."

We agree that Williams' testimony did not affirmatively harm the government's case, and that the trial court erred in ruling that it did. Williams' lack of knowledge about who fired first in no way exonerated Waldron or implicated Julian as an aggressor. Thus Williams' past statement to the prosecutor was not admissible "to neutralize affirmative harm" to the government's case. *Jefferson, supra,* 558 A.2d at 301. As *Jefferson* makes clear, the failure of a witness to give certain anticipated testimony is not affirmative harm, not even when that testimony is essential to a party's case. The purpose of the surprise statute is not to enable the party that claims surprise to fill in an unexpected gap in its proof, but rather to permit impeachment of the witness with a prior inconsistent statement. Under the statute, "prior statements of the witness are admissible only as proof that the witness is unbelievable. Accordingly, they cannot be received as substantive evidence." *Scott v. United States,* 412 A.2d 364, 367 (D.C.1980). When a claim of surprise is erroneously made and accepted, as in this case, the "only value" of impeachment with a prior inconsistent statement "is the possibility that it will be given credit as substantive proof, a use which is clearly impermissible." *Id.* at 368.

▪ Waldron suffered prejudice from the trial court's erroneous acceptance of the claim of surprise because the impeaching evidence was the only proof that Waldron fired first. No other witness testified to that effect; indeed, Williams was the only one who even said that Waldron drew his gun first.[8] *Compare In re D.A.,* 597 A.2d 1331, 1333 (D.C.1991) (trial court erroneously permitted government to impeach witnesses with prior inconsistent statements on ground of surprise, but error was harmless because other witnesses corroborated the impeaching testimony). The court's ruling allowed the jury to learn of Williams' earlier statement that Waldron

---

7. The prosecutor also explained that Glennette Williams had refused to testify before the grand jury.

8. Tracey Washington testified that Waldron and Julian both drew guns "at the same time." Stacey Washington testified that the two pulled their guns "at about the same time." Pat Washington said she did not see who drew first.

had shot first (which it would not otherwise have known about) and thus seriously damaged Waldron's claim of self-defense.

 Waldron also challenges the trial court's ruling which allowed the prosecutor to impeach Angela Paylor about whether she saw Waldron and Julian shooting at each other on July 14. The prosecutor asked Paylor whether she saw "anyone shooting" on that date, and Paylor replied that she did not. The prosecutor told the court at a bench conference that this response was a surprise and proffered that Paylor had told her, in a conversation earlier that day, that she saw the two men shooting at each other. The court upheld the claim of surprise. Paylor was then asked whether she had told the prosecutor and a detective, before lunch that day, that she saw Waldron and Julian shooting at each other on July 14, and she admitted that she had.

Waldron challenges the trial court's ruling on the prosecutor's claim of surprise, and again we agree that the witness' testimony did not cause affirmative harm to the government's case. Paylor had merely testified that she did not see any shooting on July 14. But the introduction of her prior inconsistent statement caused Waldron no prejudice because there was other evidence that a shooting had occurred: Tracey and Stacey Washington both testified that they saw Waldron and Julian shooting at each other on July 14. Thus the impeachment of Paylor was harmless error. *In re D.A.*, *supra*, 597 A.2d at 1333; *Jefferson v. United States*, *supra*, 558 A.2d at 302.

The judgment of conviction is reversed, and this case is remanded for a new trial.

*Reversed and remanded.*