Edwin L. SCOTT, Appellant,

v.

UNITED STATES, Appellee.

Richard DEWS, Appellant,

v.

UNITED STATES, Appellee.

William O. C. BROOKING, Appellant,

v.

UNITED STATES, Appellee.

Nos. 12104, 12205 and 12265.

District of Columbia Court of Appeals.

Argued Nov. 14, 1978.

Decided March 7, 1980.

Fred W. Bennett, College Pond, Md., for appellant Scott.

Thomas W. Farquhar, Washington, D. C., appointed by this court, for appellant Dews.

Lawrence Singer, Washington, D. C., appointed by this court, for appellant Brooking.

John W. Polk, Asst. U. S. Atty., Washington, D. C., for appellee. Earl J. Silbert, U. S. Atty., Washington, D. C., John A. Terry, Michael W. Farrell, and Joseph B. Valder, Asst. U. S. Attys., Washington, D. C., were on brief, for appellee.

Robert I. Richter, Washington, D. C., for appellee in No. 12104.

Richard C. Otto, Washington, D. C., for appellee in Nos. 12104, 12205, and 12265.

Carol E. Bruce, Washington, D. C., for appellee in No. 12205.

Ann P. Gailis, Washington, D. C., for appellee in No. 12265.

Before NEWMAN, Chief Judge, and PAIR and YEAGLEY, Associate Judges, Retired.

YEAGLEY, Associate Judge, Retired:

Appellants were found guilty by a jury of statutory rape under D.C.Code 1973, § 22–2801[1] and brought this appeal. Finding error in the record, we reverse.

At the time of the crime the complainant, herein referred to as A. J., was 13 years old. The day before the crime, her parents had forbidden her to see her boyfriend, Michael, then 15 years old. Nevertheless, on April 2, 1976, A. J. went to Michael's house after school and initiated sexual intercourse with him. A. J. requested him to let her stay overnight, but he told her she could not and

---

1. Appellants Scott and Dews were also charged with sodomy, but were found not guilty on that charge. All appellants were found not guilty of a lesser charge of taking indecent liberties.

began walking her home. While walking, they encountered Albert Abbot, an older man, with whom Michael was acquainted. Abbot was driving a car and agreed to give them a ride. When they arrived at A. J.'s house, she refused to get out of the car because she was angry with her parents and did not want to return home.

Abbot drove A. J. and Michael to the stables where he lived and worked in Forrestville, Maryland. The three appellants were at the stables at the time and were acquainted with Michael. Some time later when appellants Dews and Scott started to leave the stables in Dews' van, they agreed to give Michael a ride home. A. J. apparently simply followed him into the van. When they arrived at his house, he got out and told appellant Dews to take A. J. home. However, A. J. still refused to go home and instead went with Dews and Scott to appellant Brooking's apartment.

There was evidence that inside the apartment, A. J. engaged in sexual intercourse and oral sodomy with both Dews and Scott. A short time later when appellant Brooking returned to his apartment, Dews and Scott departed. Brooking took A. J. to a McDonald's restaurant to get something to eat. They then returned to his apartment and had sexual intercourse. Thereafter appellant Dews returned to the apartment and took A. J. to a store to buy a snack, after which they rode around in his van. At about midnight, he dropped her off at Brooking's apartment, where A. J. spent the remainder of the night with Brooking.[2]

Meanwhile, A. J.'s parents had been looking for her. They went to Michael's home and spoke with him and then called the police, who also went to his house to inquire as to A. J.'s whereabouts. Sometime during the evening Michael's sister called Brooking and informed him that the police were looking for A. J.

The next morning, Brooking dropped A. J. off at Michael's house, but his mother would not let her come into the house. A. J. went next door and the neighbors called her parents. A. J. was taken to the hospital where a medical examination by Dr. Karlos Vince revealed a fresh tear in her hymen and sperm in her vagina.[3]

According to appellants' evidence, when A. J. insisted that she did not want to be taken home, Dews and Scott dropped her off at a nearby gas station. Dews and Scott then parted company and spent the remainder of the night with their respective girlfriends.[4] Appellant Brooking testified that the only time he saw A. J. was at the stables. After he left the stables, he visited friends and returned to his apartment around midnight.

Appellants have made numerous assignments of error. However, in view of our disposition of the case, we discuss only the following five.

## I. Impeachment Testimony

Appellants cite two instances in which they contend the trial court erred in permitting the government to impeach its own witness. Since we agree that certain impeachment evidence was improperly allowed, we necessarily conclude that the appellants were denied a fair trial and that the convictions in this case cannot stand.

**A. Detective Lowe's Testimony.** Three days after the crime, Michael made a statement to Officer Fitzpatrick in which he said that on the night in question the following events transpired: "Dews came over. Dews asked me what I had told the police. I said I told them that you dropped me off, or had left with A. J., and Dews left."

Six months later, at a conference of witnesses at which Michael, the prosecutor, and

---

2. To rebut appellants' claim that A. J. had never been in Brooking's apartment, the government presented evidence demonstrating A. J.'s familiarity with the apartment's location, layout, and furnishings.

3. Although Dr. Vince testified that the examination results were consistent with A. J.'s having had intercourse with either a 14-year-old male or an adult male, Michael testified that he did not have an orgasm when he had sexual intercourse with A. J.

4. Appellant Scott also testified that he was incapable of having sexual intercourse at the time because of a recent hernia operation.

Detective Lowe were present, Michael gave a different version of that conversation, stating that it had been as follows:

> Dews: What did you tell the police, Michael?
>
> Michael: I told them you left with her in the van.
>
> Dews: What did you do that for. She might say we took her some place or raped her.

When Michael was called as a government witness at trial, the prosecutor sought to have him relate these conversations to the jury. It became apparent that this attempt would be frustrated when he testified that on the night of the crime, appellant Dews came to his (Michael's) house before, rather than after, the police. If Dews arrived first, he could not have been concerned with what Michael told the police. Michael's previous statements clearly indicated that the police had spoken to him before Dews arrived. On further direct examination by the prosecution, Michael denied having made both the statement to Officer Fitzpatrick and the later statement to Detective Lowe and the prosecutor.

At a bench conference, the prosecutor admitted that two days prior to trial he had interviewed Michael and at that time he denied having stated that appellant Dews said: "What did you do that for. She might say we took her some place or raped her." Thus, the parties agree that while the prosecutor was surprised that Michael repudiated the statement he made to Officer Fitzpatrick, there was no surprise when he repudiated the statement made to Detective Lowe and the prosecutor. The trial court permitted the government to impeach him by calling Officer Fitzpatrick and Det. Lowe to testify to the two prior statements. The court ruled that even though there was no surprise as to the repudiation of his statement to Det. Lowe, the latter's testimony would constitute reasonable impeachment of the surprising testimony. We cannot agree.

Appellants claim that the government was improperly allowed to impeach its own witness with Det. Lowe's testimony insofar

as it referred to appellant Dews' expression of fear that he might be accused of rape, since there was no surprise when Michael denied ever relating Dews' alleged statement. Appellants argue that the impeaching evidence should have been limited to the less damaging testimony on which the government was surprised. The government's position is that once surprise was established, it was permissible to impeach the witness with any prior statement which was inconsistent with any of the witness's material testimony. Since the determination of whether and to what extent impeachment of one's own witness should be allowed is within the trial court's discretion, *Robinson v. United States*, 113 U.S. App.D.C. 372, 308 F.2d 327 (1962), it is not one that we lightly disturb. However, we must conclude that it was reversible error for the court to admit Det. Lowe's impeachment testimony as to the statements of Michael with which the prosecutor was not surprised.

■ It is the rule of this jurisdiction that a party cannot impeach its own witness unless the court finds that the party was surprised by the witness's testimony:

> When the court is satisfied that the party producing the witness has been taken by surprise by the testimony of the witness, it may allow the party to prove, for the purpose only of affecting the credibility of the witness, that the witness has made to the party or to his attorney statements substantially variant from his sworn testimony about material facts in the cause. [D.C.Code 1973, § 14–102.]

As this section expressly provides, prior statements of the witness are admissible only as proof that the witness is unbelievable. Accordingly, they cannot be received as substantive evidence. The sole reason such impeachment is permitted is to cancel or neutralize any damaging effect of the surprising testimony. *Byrd v. District of Columbia*, D.C.Mun.App., 43 A.2d 46 (1945). Therefore, in order to justify impeachment, the party must demonstrate not only surprise, but affirmative damage to its case as

well. As we noted in *Byrd, supra*, where there is no such prejudice, there is no occasion for impeachment.

█ In this instance, the damage to the government's case occasioned by the surprising testimony was that the government was unable to introduce certain evidence that it had expected to elicit from Michael. As we discussed at length in *Byrd, supra*, when a witness unexpectedly gives testimony which affirmatively harms the producing party's case, the party has a legitimate need to demonstrate to the trier of fact that the witness is not credible. In contrast, however, when, as in this case, the witness merely fails to give certain hope for testimony, it does not reach the problem nor advance the party's cause to attempt to prove that the witness is unbelievable. In the latter situation, impeachment is a useless gesture if the evidence is confined to its legitimate purpose of discrediting the witness. Its only value is the possibility that it will be given credit as substantive proof, a use which is clearly impermissible.

█ The prejudicial impact of Detective Lowe's testimony cannot be questioned. Her testimony attributed to appellant Dews statements which not only incriminated him, but which tended to incriminate the other defendants as well. The testimony was pure hearsay, which was not subject to meaningful cross-examination by any of the defendants[5] and which had none of the recognized earmarks of reliability.[6] Since the sole justification for impeachment of one's own witness is to remove the damage cause by the surprise testimony, the scope of impeachment must be limited to evidence which will further that end. *See Byrd v. District of Columbia, supra; Taylor v. Baltimore & Ohio R.R.*, 344 F.2d 281, 283–84 (2d Cir.), *cert. denied*, 382 U.S. 831, 86 S.Ct. 72, 15 L.Ed.2d 75 (1965); *Culwell v. United States*, 194 F.2d 808 (5th Cir. 1952).

Impeachment cannot be allowed as a means "to supply the anticipated testimony." *Young v. United States*, 97 F.2d 200 (5th Cir. 1938).

In *United States v. Morlang*, 531 F.2d 183, 190 (4th Cir. 1975), the court, citing *Bridges v. Wixon*, 326 U.S. 135, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945), remarked on the ultimate danger of this type of evidence:

> Witnesses may, of course, sometimes fail to come up to the expectations of counsel and in such situations there is an understandable temptation to get before the jury any prior statement made by the witness. And it may be that in certain instances impeachment might somehow enhance the truth-finding process. Yet, whatever validity this latter assertion may have, it must be balanced against the notions of fairness upon which our system is based. Foremost among these concepts is the principle that men should not be allowed to be convicted on the basis of unsworn testimony.

After Det. Lowe was permitted to testify regarding Michael's statement to her (which recounted Dews' statement to Michael on the evening of April 2), appellants requested a limiting instruction on the limited purpose for which the testimony was admitted, *i. e.*, as going solely to the credibility of Michael as a witness. Such an instruction was given, admonishing the jury that the testimony was not to be used as substantive evidence against any of the defendants. Appellants also requested, but were denied, a limiting instruction to the effect that Dews' statement, contained in Michael's alleged prior statement to Det. Lowe, could not be used as evidence against either of Dews' codefendants; Scott and Brooking. Although the jury had been instructed that Det. Lowe's testimony was not to be considered as substantive evidence, the jury would nonetheless be likely to consider Dews' statement as an admis-

---

5. Detective Lowe was the only witness to testify regarding the statement. The declarant, Michael, could not be cross-examined meaningfully, since he completely denied having made the statement. *See In Re L.D.O.*, D.C.App., 400 A.2d 1055 (1979). Nor could appellants Brook-

ing and Scott cross-examine appellant Dews because he did not take the stand.

6. In addition to falling outside the exceptions to the hearsay rule, this statement was not corroborated by any independent evidence at trial.

sion applicable to all three defendants. The statement, "she might say *we* took her some place and raped her" (emphasis added), is powerfully incriminating in the context that Dews sought, on the night of the incident, to ascertain what Michael had told the police. Clearly, under *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), it could never be admissible against appellants Scott and Brooking, and a limiting instruction emphasizing that it is not to be so used would protect against improper jury inferences. Although the statement does not meet the requirements of *Smith v. United States*, D.C.App., 312 A.2d 781 (1973), to mandate a reversal under *Bruton* for a failure to sever, the limiting instruction as to the parties, given by the trial court in *Smith*, would have been appropriate here. *See Borrero v. United States*, D.C.App., 332 A.2d 363, 366 (1975).

The government's brief correctly contends that *Bruton* is not directly applicable, but that issue is not before us now. More importantly, though, it raises the possibility that an instruction limiting the applicability of Dews' statement as to Scott and Brooking *in* appropriately leads the jurors to conclude that they *may* consider Dews' statement as substantive evidence against him. If we assume, arguendo, that Det. Lowe's testimony was properly admissible, it was admitted for impeachment purposes only. The trial court denied the further limiting instruction because it could confuse the jury. It is illogical to limit the applicability of impeachment testimony to one of several defendants where the impeached witness has testified to events involving all three defendants. A witness's general credibility is either impeached or not, it cannot be impeached with regard to just one defendant, unless the basis for impeachment is bias or some other specific basis. *Cf. Ellsworth v. United States*, D.C.App., 300 A.2d 456, 548 (1973) (*no* basis for *Bruton*-type of limiting instruction when codefendant's prior statement was testified to by officer, to rebut charge of recent fabrication; codefendant testified to statement first).

B. *Albert Abbot's Testimony.* The second claim of error involves the hearsay testimony of another prosecution witness, Albert Abbot, the man who drove Michael and the complainant to the stables. Abbot was permitted to testify that during the ride, in the absence of all of the defendants, Michael said to him, in reference to the complaint: "She's a nice little girl, isn't she . . . would you like a piece of this?" According to the government, the fact that Michael said this to Abbot was probative of whether he might have made similar remarks to appellants Dews and Scott, which in turn was probative of whether they committed sexual acts with the complainant. When the prosecution first attempted to elicit this statement from Abbot, the trial court ruled that the statement was inadmissible unless the government could establish as a predicate that Michael spoke to Dews and Scott shortly after he made the remark to Abbot.

Through Michael's subsequent testimony the government was able to show that he had spoken to Dews and Scott while they were at the stables and later, while riding in the van. However, he specifically denied having made this remark to either Abbot or appellants. Nonetheless, Abbot was then recalled and allowed to relate to the jury the statement he claims Michael made to him.

■ Appellants contend that this testimony was improperly received as impeachment evidence against Michael, the government's own witness. Since the government admitted that it was not surprised by Michael's denial, there clearly was no basis for allowing the government to use Abbot's testimony to impeach him.

The government argues that Abbot's testimony was not received for impeachment purposes, but rather for its value as substantive evidence of guilt. This argument is equally troublesome. Notwithstanding the foundation laid by the government, Abbot's testimony was pure hearsay testimony of what was said by an available witness and was highly prejudicial. The government contends that if Michael said to Abbot "she's a nice little girl . . . would you

like a piece of this?" there was an increased possibility that similar suggestions were made to Dews and Scott (despite Michael's specific denial), "thus prompting them to embark on their criminal escapade."

We find each of these inferences tenuous and the combination impermissibly speculative. The fact that Michael had an opportunity to make similar remarks to Dews and Scott was wholly inadequate as a foundation. Michael's contact with appellants occurred a good while later, under somewhat different circumstances, and perhaps most importantly, involved two entirely different people. The remark itself was somewhat ambiguous. Since he denied making it, appellants had no meaningful opportunity through cross-examination to clarify it, put it into context, or draw out other factors bearing on the possibility that Michael repeated it. Even assuming that Abbot's testimony was of some minimal probative value, it was heavily outweighed by the resulting prejudice to appellants. The testimony should not have been allowed and its admission constitutes reversible error.

## II. *Jury Contamination*

The government called Dr. Karlos Vince to testify about his medical examination of the complainant.[7] During a bench conference which interpreted Dr. Vince's testimony, Dr. Vince allegedly approached the jury box and spoke to some of the jurors. Upon learning of this, appellants moved for a mistrial and the court conducted an inquiry into the matter.

According to Dr. Vince, he showed one of the jurors a pamphlet dealing with the importance of careful medical examination of rape victims and commented that attorneys were inept at questioning medical experts. Only two jurors stated that they had heard Dr. Vince and they were questioned by the court out of the presence of the remaining jurors. One juror recalled only that Dr.

Vince expressed some concern that the jury was tired of listening to his testimony. The other juror saw the pamphlet and recalled Dr. Vince saying that he did not know what the defense attorneys wanted from him (apparently referring to their cross-examination of him). Both jurors stated that their ability to be impartial had not been impaired.

The trial court refused to allow defense counsel to ask these jurors further questions or to pose additional questions to be asked by the court.[8] The court denied the motion for mistrial, ruling that there was no factual basis for finding "substantially improper communication" or any taint to the jury.

While it is not clear that Dr. Vince made statements that would contaminate the jury, this does not end the matter. We note that the Supreme Court held in *Mattox v. United States*, 146 U.S. 140, 147–59, 13 S.Ct. 50, 53, 36 L.Ed. 917 (1892), that:

Private communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear.

Once it is established that such communications have occurred, a heavy burden falls upon the government to dispel the inference of prejudice. In *Ryan v. United States*, 89 U.S.App.D.C. 328, 191 F.2d 779 (1951), the court observed that where the trial court properly investigated charges of jury contamination, its ultimate ruling on a motion for a new trial was discretionary and would not be disturbed on appeal if reasonably supported by the record. The court suggested that the proper procedure was to conduct a full evidentiary hearing and to allow the jurors involved to be examined and cross-examined. While it is important for the trial court to retain dis-

---

7. The transcript of Dr. Vince's testimony reveals that at times he testified in a rambling, unresponsive manner, interjecting prejudicial extraneous remarks at will. Despite repeated objections, the trial court permitted this highly inappropriate testimony to continue and would

not instruct the witness to be responsive to counsel's questions.

8. Counsel sought, *inter alia*, to inquire as to whether Dr. Vince made any derogatory remarks about the attorneys in the case.

cretion in determining the extent and type of questioning appropriate under the circumstances of the case, once it is established that improper communications have occurred, a searching inquiry for evidence of bias or prejudice must be made.

██ The remarks, while related to the trial, were not patently prejudicial. The court made inquiry of the witness and the two jurors to determine just what was said and what the jurors' reaction was. Since the trial court was in the best position to judge the impact the incident had on the jury, we cannot say it was an abuse of discretion to conclude, as the court did, that further inquiry might taint the jury more than did the witness's remarks. Otherwise, further inquiry was clearly called for.

### III. Leading Questions

██ Appellants contend that the trial court abused its discretion in permitting the government to make extensive use of leading questions in its direct examination of the complaining witness.[9] There is no question but that a great deal of evidence was introduced in this manner. The record before us reveals that despite the fact that she was 13 years old, the complaining witness was able and willing to discuss sexual matters without being led by the prosecutor. On a number of occasions, suggestive questions were posed, not to refresh the witness's memory or to help her communicate, but rather to encourage her to contradict previous testimony which was unfavorable to the government. In addition, the complainant appears to have been extremely suggestible. Nevertheless, the trial court found appellants' motion to strike the testimony which was elicited by leading questions to be "without any substantial merit on its surface. It will be denied without any further consideration." While it is often necessary to use leading questions in the case of a young witness, age is not determinative. The legitimate need for such questions must be balanced against the

danger that they will supply the witness with a false memory. United States v. McGovern, 499 F.2d 1140, 1142 (1st Cir. 1974). Since the trial court is in the best position to observe the witness and make this determination, it is largely committed to the trial court's discretion and we adhere to that policy here. United States v. Durham, 319 F.2d 590 (4th Cir. 1963). However, we admonish the trial court to exercise its discretion judiciously if the issue arises on remand.

### IV. Jury Instructions

██ Appellants preserved for appellate review two claims of error involving the jury instructions given on the issue of flight and on the evidentiary value of an indictment. With regard to the latter, the law is clear that an indictment is not evidence. It is impermissible for the trier of fact to consider it as evidence of any kind or to draw an inference of guilt from it. See Criminal Jury Instructions for D.C., § 2.06 (1978). It was improper and misleading for the trial court to twice instruct the jury in this case that an indictment was "not evidence in and of itself."

██ The objection to the flight instructions was raised by appellant Brooking, the only defendant against whom evidence of flight was introduced. He contends that the evidence of flight was insufficient to warrant an instruction on flight and that the instruction given was inadequate. We agree. A flight instruction is improper unless the evidence reasonably supports the inference that there was flight or concealment and that the defendant fled because of consciousness of guilt and actual guilt of the crime charged. See United States v. Myers, 550 F.2d 1036 (5th Cir. 1977); Austin v. United States, 134 U.S. App.D.C. 259, 262 n. 3, 414 F.2d 1155, 1158 n. 3 (1969); see generally Note, Rule 403 and the Admissibility of Evidence of Flight in Criminal Trials, 65 Va.L.Rev. 597, 603–08 & n. 65 (1979). The government produced

---

9. Appellants also object to the leading questions permitted to be asked of the then 16-year-old Michael. The court summarily overruled the objections at trial, stating no reasons. It is not clear that any judgment was exercised here.

evidence that the day after the crime, the landlord of the building in which Brooking lived received notice that the apartment would be vacated. One day later, when Brooking went to the stables, he was told that the police were looking for him. Thereafter, Officer Fitzpatrick was unsuccessful in three attempts to locate Brooking at the stables, and when the same officer tried to call Brooking at a phone number found in appellant Dews' wallet with the name "Chubby" beside it (there was evidence that this was Brooking's nickname), he found that the phone had been disconnected.

This evidence does not reasonably support an inference of flight or concealment and is an insufficient foundation for giving the flight instruction. There was no verification that the phone number called was Brooking's correct number. The notice to vacate was not given by Brooking, but rather by a Ms. Oliphant, the actual lessee of the apartment and a friend of the appellant. Finally, the police made no attempt to find Brooking in the most obvious place, his place of residence, and the first time they went to his place of employment, they found him there.

■ We agree with appellant that this error was compounded by the instruction given—the standard jury instruction on flight—No. 2.44 of the *District of Columbia Bar Association Criminal Jury Instructions for the District of Columbia* (2d ed. 1972). Although the instruction indicated the extent to which flight evidence could be considered as evidence of guilt, the court did not instruct the jury that it first had to find evidence of flight. The prosecutor suggested that the standard instruction be prefaced with a phrase such as, "if you find evidence of flight . . . ." Such a statement would have informed the jury that it was not bound to consider the flight evidence unless it was convinced that flight had been established. Where flight evidence was as tenuous as it was in this case, such a prefatory remark was essential and it was error not to have used it.

## V. *Prior Consistent Statements*

We also have a problem with the trial court allowing A. J., A. J.'s parents, and Det. Gayle to testify, over objection, regarding out-of-court statements made by A. J. on the day following the alleged incident. Neither the government in proffering the testimony nor the trial court in overruling the appellants' objections articulated a theory why these out-of-court statements were admissible. On review, we find none of the three possible bases for admissibility is applicable.

■ As discussed in Scott's brief at 40–41, the theory of excited utterance is not applicable because A. J. clearly had ample opportunity to reflect between the time of the alleged incidents on the evening of April 2 and the following morning, when she made the statements to her parents and to Det. Gayle. The second possible basis, and the only one relied on by the government, *see* its brief at 33–34, is that these prior ("consistent") statements are corroboration of a sexual assault on a female child, which corroboration is required by *Douglas v. United States*, D.C.App., 386 A.2d 289, 294 (1978); *see In re L.A.G.*, D.C.App., 407 A.2d 688 (1979). There is nothing in *Douglas* (or *L.A.G.*), however, that waives the rules of evidence as to corroborating evidence.

■ As a third basis, it is arguable that the prior "consistent" statements made by A. J. were admissible to rehabilitate her after she was impeached. Even under this theory, it was error to allow A. J. to testify as to her prior statements before she had been subjected to cross-examination, but premature admission is not itself a sufficient basis for reversible error. *See United States v. Wiggins*, 174 U.S.App.D.C. 166, 530 F.2d 1018, 1022 (1976); *United States v. Smith*, 160 U.S.App.D.C. 221, 224, 490 F.2d 789, 794 (1974). The jurisdictions are divided as to whether impeachment by inconsistent statements opens the door to the use of consistent statements in support of the witness. *See* McCormick, Law of Evidence § 49 at 106 (2d 1972). In this jurisdiction,

however, the United States Circuit Court held in *Coltrane v. United States*, 135 U.S. App.D.C. 295, 418 F.2d 1131 (1969), that prior consistent statements are ordinarily inadmissible. The *Coltrane* court indicated that they are admissible for rehabilitation purposes only in "exceptional situations," and may *not* be used to support a witness's credibility generally. *Coltrane* has been re-affirmed in the recent case of *Rease v. United States*, D.C.App., 403 A.2d 322, 327–28 (1979). The theory is that "mere repetition does not imply veracity," and that once an inconsistency in statements is shown, evidence of additional consistent statements does not remove the inconsistencies. More-over, in this case, the complainant's state-ments to her parents and to Det. Gayle were in many ways concededly inconsistent with her trial testimony. *Rease* states that there are two recognized "exceptional situa-tions" in this jurisdiction, where (1) there is a charge of recent fabrication, or (2) "the witness's testimony has been impeached by a portion of a statement which also contains relevant information that could be used to meet the force of the impeachment." *Id.* at 328 n. 7. The trial court made no determi-nation of a basis for such an exceptional situation nor any determination that the complainant's statements to her parents

and to Det. Gayle met the force of the impeachment. Absent such determinations, the trial court simply failed to exercise its discretion.

Although appellants have raised a num-ber of other issues some of which are not frivolous, and claim that because of the numerous errors they were denied a fair trial, we do not reach these additional claims in view of our disposition of the foregoing issues. Nevertheless, we feel constrained to note that the lengthy tran-script contains numerous instances of unfair judicial and prosecutorial conduct. In many instances, defense objections to prose-cutorial infractions were overruled for no reason apparent in this record. The cumulative errors raise serious doubt that appellants' right to a fair and impartial trial was accorded appropriate concern.

For the foregoing reasons, the cases must be reversed and remanded for a new trial.

*So Ordered.*