**Henry C. BROWN, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 01–CF–1259.

District of Columbia Court of Appeals.

Argued Feb. 4, 2004.

Decided Aug. 25, 2005.

Todd A. Cox, Public Defender Service, with whom James Klein, Sandra K. Levick, and Timothy P. O'Toole, Public Defender Service, were on the brief, for appellant.

Jessie K. Liu, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney at the time the brief was filed, and John R. Fisher, Elizabeth Trosman, and Seth B. Waxman, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, Chief Judge,* and RUIZ, Associate Judge, and BELSON, Senior Judge.

* Judge Washington was an Associate Judge of the court at the time of argument. His status changed to Chief Judge on August 6, 2005.

WASHINGTON, Chief Judge.

After a jury trial, appellant Henry Brown ("Brown") was convicted of two counts of unlawful distribution of a controlled substance[1] and one count of unlawful possession with intent to distribute a controlled substance.[2] On appeal, Brown contends that the trial court committed prejudicial error when it instructed the jury (1) that the government had "no duty" to collect corroborative evidence; and (2) that the jury's verdict must be based "solely on the evidence presented at the trial," arguing that the combination of these instructions prevented the jury from finding a reasonable doubt based on the absence of corroborative evidence. According to Brown, the trial court's subsequent failure to tell the jury that it could find a reasonable doubt based on a "lack of evidence" violated *Smith v. United States*, 709 A.2d 78 (D.C.1998) (en banc), and compounded the error. Finally, Brown argues that the trial court erred in admitting the notes and prior testimony of a police officer because these were inadmissible prior consistent statements. We affirm.

## FACTUAL SUMMARY

### A. The Prosecution's Case

On the morning of October 5, 1999, detectives with the United States Park Police set up a mobile observation post[3] at the 700 block of Park Road in Northwest Washington. At approximately 7:15 a.m., observation post officer Anastasios Kapetanakos ("Detective Kapetanakos"), parked a van on the north side of Park Road and began watching the area for drug activity. After a short time, he noticed two men, whom he identified in court as Brown and his co-defendant Anthony Ferrell, Jr. ("Ferrell"), "milling around" the area. According to Detective Kapetanakos, Brown was wearing a green jacket, blue jeans, and a black-and-white FUBU[4] hat, while Ferrell was wearing black jeans, a hooded sweatshirt, and a thick blue parka.[5] Detective Kapetanakos testified that around 8:20 a.m. four men and one woman approached Brown and Ferrell at the corner of Park Road and Georgia Avenue. One of the men handed Brown some money, which Brown counted and handed back. Growing suspicious, Detective Kapetanakos broadcast a lookout identifying Brown and Ferrell as possible drug dealers.

Detective Richard White, Jr. ("Detective White") testified that he received Kapetanakos' call shortly after 8:00 a.m. directing him to Park Road and telling him to be on the lookout for a man in a "green jacket and blue jeans" and another wearing "a blue parka type jacket and black pants." Detective White parked his vehicle across from an alley on the 700 block of Park

---

1. In violation of D.C.Code § 33–541(a)(1) (1998 Supp.), currently D.C.Code § 48–904.01(a)(1) (2001).

2. In violation of D.C.Code § 33–541(a)(1) (1998 Supp.), currently D.C.Code § 48–904.01(a)(1) (2001).

3. As explained during the trial, a "mobile observation post" involves three separate units each having a different function. First, an "observation post officer," stationed in the observation post, will identify suspected drug dealers and buyers and call out a description over the radio to the other units in the operation. A "trail officer" will follow the so-identified dealer or buyer out of the area and remain with that dealer or buyer until a third unit, "the arrest team," arrives in an unmarked police car to make the arrest.

4. FUBU, which stands for "For Us, By Us," is a fashion label specializing in urban gear.

5. Although Detective Kapetanakos had used binoculars at least part of the time, he got a close look at Brown and Ferrell more than once, when they walked "within three feet" of his van.

Road, where he pretended to be a "junkie" injecting a needle into his arm and "nodding out." At that point, Detective White saw two individuals matching the description that Detective Kapetanakos had given him. In court, he identified Brown and Ferrell as being the individuals he had seen that day.

While Detectives Kapetanakos and White watched, Brown went into the nearby alley and, after retrieving an object from the ground next to a guardrail, motioned to Ferrell and a group of others, shouting, "[H]urry up, hurry up." Both Detectives testified that Ferrell appeared to stand watch at the entrance to the alley while the group of people approached Brown. According to Detective Kapetanakos, the man who had offered Brown money outside the alley approached first, handed Brown some cash, and received a small object in return.[6] Immediately thereafter, two men dressed in similar-looking uniforms handed Brown some cash in return for small objects. The detectives then watched as a woman engaged in a fourth, identical transaction with Brown.

According to both detectives, after Brown and Ferrell had left the alley and were heading west along Park Road, Brown counted out a sum of money and handed it to Ferrell. Detective White testified that Brown walked to a nearby fence where he placed a small package down on the ground by the fence line. At about that same time, Detective Kapetanakos received word that two of the alleged buyers had been stopped in the area and found to be in possession of heroin. He immediately radioed the arrest teams to arrest Brown and Ferrell, directing the officers to their location at a nearby gas station. While Detective Kapetanakos was watching the arrest, Detective White was retrieving the small package that he had seen Brown place by the fence line. The small package was later found to contain eight blue ziplock bags of heroin. Shortly after their arrest, Detective Kapetanakos went to the United States Park Police Station and identified Brown and Ferrell as the seller and lookout he had observed earlier.

## B. Brown's Defense

Brown proceeded to trial on the theory that Detectives Kapetanakos and White had mistakenly arrested him after observing a *different* man selling drugs on the morning of October 5, 1999: Brown's defense relied primarily on a police photograph that had been taken shortly after his arrest, in which he was not wearing the "black and white FUBU hat" that Detective Kapetanakos had consistently described the seller as wearing during the drug transactions. Instead, the photograph showed Mr. Brown with a full beard and mustache, a black-and-white striped shirt, and a hat with a "Dale Earnhardt" logo on it. The defense sought to discredit Detective Kapetanakos' identification by pointing out the discrepancies between his description of the seller's appearance (green jacket, blue jeans, and black-and-white FUBU hat) and the photograph of Brown (facial hair, black-and-white striped shirt, Dale Earnhardt hat).

Brown's attorney also sought to weaken the prosecution's case by pointing out that the detectives had not obtained any corroborative evidence to support their eyewitness account of the crime. For example,

---

6. Because Detective White had not been present for the initial encounter that had taken place outside of the alley, he did not testify that this was the same individual who had previously offered money to Brown. Detective White, however, corroborated Detective Kapetanakos' testimony that Brown exchanged "something" for cash with "an unidentified black male."

while cross-examining Detective White, Brown's attorney elicited testimony that although the Park Police had the option of recording the communications made during the observation post operation, they chose to communicate using an unrecorded channel.[7] Detective White's testimony on cross-examination also revealed that he had not taken any photographs during the illicit transactions or following the arrests. During closing arguments, Brown's attorney twice mentioned the government's failure to collect corroborative evidence.[8] Specifically, counsel argued that the jury could find a reasonable doubt because the government had not taken any fingerprints, photographs, recorded communications, or videotape recordings documenting Brown's alleged participation in the crime.

In anticipation of Brown's closing argument regarding the government's failure to produce corroborative evidence linking Brown to the crime, the prosecution requested a jury instruction stating that the government was under "no obligation to put forth that type of evidence." The prosecution referred the court to dictum in *Greer v. United States,* 697 A.2d 1207, 1211 (D.C.1997), in which this court suggested that, under certain circumstances, the government "probably could [ ] obtain[ ] an instruction, that it was under no legal obligation to create corroborative evidence." *Id.* Although the trial court refused to rule on the request until after it had heard the defense's closing arguments,

it put Brown "on notice ... that if you argue, ladies and gentlemen, you don't have a photograph, you don't have a videotape of this transaction, I think you can expect that the Government will request and the Court will grant the request for a *Greer*-type instruction." The following day, Brown's attorney objected on the ground that the prosecution had not laid an adequate "foundation" to support a *Greer*-type instruction.

> Your Honor, I just would object for the record, I've asked Detective White whether he took any fingerprints and photographs, there's been no evidence that they aren't required to do so and I think an instruction from the Court or even argument from the Government that they aren't required to do so really would be prejudicial, given the fact that there's no evidence, frankly as I stand here today, I don't know whether they're required to do that, and I can't—maybe its true with the Metropolitan Police Department but I don't know if that's true with the U.S. Park Police. I think *Greer* allows us to argue, as the Court knows, that there aren't—this is not corroborative, *Greer* says that the Government's probably entitled to an instruction, and that's an MPD case. I just would ask the Court not instruct, the Government not be allowed to argue, [the prosecutor] could have asked any number of his witnesses whether they were required to do that and he did not,

---

7. On re-direct, Detective White explained that the officers used an unrecorded channel in order to prevent people with police monitors from "know[ing] what we're doing and where our operation is."

8. In closing, defense counsel made the following remarks about the lack of corroborative evidence: "[T]he Government hasn't given you much more than Officer [Kapetanakos] and Officer White, they haven't given you any fingerprints, they haven't given you any pho-

tographs, no recorded communications, no videotape, and, ladies and gentlemen, they could have done all of those things, but there is nothing except for these two officers' testimony." Later, defense counsel told the jury, "And again, ladies and gentlemen, no physical evidence, corroborative evidence, proving that Mr. Brown is guilty. No fingerprints on that money, no fingerprints on the drugs, nothing but Detective [Kapetanakos] and Officer White to some extent."

so I would certainly ask that that be the status of the instruction and argument. That's all.

In response, the trial court indicated that it still planned to instruct the jury "that the park police are under no obligation to videotape, fingerprint, photograph or otherwise." In addition, the court refused to allow Brown's attorney to tell the jury during her closing argument, "there's been no evidence that [the Park Police are] not required to do so."

## ANALYSIS

### A. Jury Instructions

On appeal, Brown argues that the trial court erred in reading three jury instructions, the combination of which prevented the jury from considering the government's failure to collect corroborative evidence as a basis to find reasonable doubt as to his guilt. First, the court gave the "no duty" instruction.

> There's been some testimony and argument about the failure of the police to photograph or videotape the alleged drug activity or to take fingerprints in this case. You are instructed that the Government is under no duty to videotape or photograph alleged criminal conduct observed by an undercover police officer or to take fingerprints.

Second, immediately after reading the "no duty" instruction, the trial court told the jury:

> Remember, you must decide what weight, what value to place on all of the evidence, and you must determine the believability or what we call the credibility of the witnesses. Your decision in this case must be made solely on the evidence presented at the trial.

A few minutes later, the court read an outdated version of the Redbook jury instruction regarding reasonable doubt,[9] and, in doing so, failed to tell the jury that a reasonable doubt could be based upon a "lack of evidence in the case." *See Smith*, 709 A.2d at 82.[10]

---

**9.** The trial court gave the following reasonable doubt instruction:

> Reasonable doubt, as the name implies, is a doubt based upon reason, a doubt for which you can give a reason, it's such a doubt as would cause one of you, ladies and gentlemen, after careful and candid and impartial consideration of—of all the evidence to be so undecided that you could not say you are firmly convinced of the defendant's guilt. It is such a doubt as would cause a reasonable person to hesitate or pause in the graver or more important transactions of life. However, it's not a fanciful or whimsical doubt, nor a doubt based upon guesswork, it is a doubt which is based upon reason. The Government is not required to establish guilt beyond all doubt or to a mathematical or scientific certainty, its burden is to establish guilt beyond a reasonable doubt.

**10.** The full instruction adopted by this court in *Smith*, 709 A.2d at 82, is as follows:

> The government has the burden of proving the defendant guilty beyond a reasonable doubt. In civil cases, it is only necessary to prove that a fact is more likely true than not, or, in some cases, that its truth is highly probable. In criminal cases such as this one, the government's proof must be more powerful than that. It must be beyond a reasonable doubt.
>
> Reasonable doubt, as the name implies, is a doubt based upon reason—a doubt for which you have a reason based upon the evidence or lack of evidence in the case. If, after careful, honest, and impartial consideration of all the evidence, you cannot say that you are firmly convinced of the defendant's guilt then you have a reasonable doubt.
>
> Reasonable doubt is the kind of doubt that would cause a reasonable person, after careful and thoughtful reflection, to hesitate to act in the graver or more important matters in life. However, it is not an imaginary doubt, nor a doubt based on speculation or guesswork; it is a doubt based upon reason. The government is not required to prove guilt beyond all doubt, or to a mathematical or scientific certainty. Its burden is to prove guilt beyond a reasonable doubt.

Brown maintains that the trial court erred in giving the "no duty" instruction without first requiring the government to affirmatively *prove* that it was under no duty to create and present corroborative evidence. In addition, Brown argues that the combination of the three instructions effectively told the jury that it could ignore the lack of corroborative evidence in violation of the well-settled rule that "[r]easonable doubt is a doubt arising from the evidence, or from a *lack of evidence,* after consideration of all the evidence." *Bishop v. United States,* 71 App. D.C. 132, 138, 107 F.2d 297, 303 (1939) (emphasis added).

### 1. Standard of Review

■ In order to preserve a jury instruction issue for appeal, Superior Court Criminal Rule 30 requires a party to "object[ ] thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds of the objection." Consistent with this rule, we have said that "objections to jury instructions must be specific enough to direct the judge's attention to the correct rule of law; a party's request for jury instructions must be made with sufficient precision to indicate distinctly the party's thesis." *Russell v. United States,* 698 A.2d 1007, 1012 (D.C.1997) (citing *Hasty v. United States,* 669 A.2d 127, 134 (D.C. 1995), and *Cowan v. United States,* 629 A.2d 496, 503 (D.C.1993)). When a defendant fails to object to an instruction in the manner required by Rule 30, we are limited to reviewing that instruction for plain error. *See Green v. United States,* 718 A.2d 1042, 1056 (D.C.1998) (citing *Robinson v. United States,* 649 A.2d 584, 586 (D.C.1994)).

■ Brown objected to the trial court's reading of the "no duty" instruction on grounds that the government lacked a foundation for the instruction because it had not affirmatively shown that the Park Police were under no obligation to collect corroborative evidence. Brown did *not,* however, object when the trial court instructed the jury, "[y]our decision in this case must be made solely on the evidence presented at the trial." Brown also failed to object to the trial court's reasonable doubt instruction. We have said "[t]he purpose of Rule 30 is 'to give the trial court the opportunity to correct errors [in] and omissions' from the charge to the jury." *Green,* 718 A.2d at 1056 (quoting *Johnson v. United States,* 387 A.2d 1084, 1089 (D.C.1978) (en banc)) (alteration in original). In accordance with Rule 30, Brown has preserved his argument that the "no duty" instruction required a foundational predicate, and we may review this challenge *de novo. See Little v. United States,* 709 A.2d 708, 711 (D.C.1998) (the accuracy of a jury instruction presents a question of law that is reviewed *de novo* ). Brown, however, never asked the trial court to consider whether the "no duty" instruction, when read in conjunction with two unrelated (and unchallenged) instructions, would lead the jury to assess reasonable doubt without considering the lack of corroborative evidence. Because the trial court never had the opportunity to address that argument, we may reverse on *that* basis only if we find plain error. As explained more thoroughly below, we find that the trial court erred when it instructed the jury that the government had "no duty" to collect corroborative evidence. Although the trial court's failure to give the *Smith* reasonable doubt instruction was an obvious error, we do not think that it rises to the level of plain error, even when combined with the other two instructions.

### 2. The "No Duty" Instruction

■ In *Greer,* we made it clear, citing *United States v. Hoffman,* 296 U.S.App.

D.C. 21, 25, 964 F.2d 21, 25 (1992), that before a defendant can argue to a jury that had certain available evidence been produced by the government it would have been favorable to the defendant, he or she must first affirmatively establish that the government's failure to collect that evidence violated standard police procedures. *See Greer,* 697 A.2d at 1211. We went on to state that if a defendant makes such an argument without first establishing that the government has such a duty, the government may be entitled, upon request, to a "no duty" instruction as a matter of law. *Id.*

Appellant does not appear to take exception to this general proposition. Instead, he argues that the trial court erred in giving the instruction in this case because appellant merely argued at trial that by not producing certain evidence, the government had failed to meet its burden of proving appellant's guilt beyond a reasonable doubt. According to appellant, under those circumstances, the government must introduce some evidence that the police have no such duty to collect corroborative evidence before a "no duty" instruction can be given. We agree.

In this case, the defendant did not argue that the jury could infer that the evidence the government failed to produce would have been favorable to the defense. Rather, the argument made to the jury was

that the lack of corroborating evidence should undermine the jury's confidence that the government had met its burden of proof in this case. In *Greer,* we specifically sanctioned such an argument when we stated that "defense counsel may appropriately comment in closing argument on the failure of the government to present corroborative physical evidence." *Greer,* 697 A.2d at 1210. This proposition is firmly grounded in the *Smith* reasonable doubt instruction that makes it clear that a jury may consider the lack of corroborative evidence in deciding whether the government has met its burden of proof. *See Smith,* 709 A.2d at 82.

■■■■ Because appellant's counsel had not made a "missing evidence" argument to the jury, the government was not entitled to a "no duty instruction" as a matter of law. Instead, the government was required to lay an evidentiary foundation entitling it to such instruction.[11] In this case, the government failed to produce any evidence that park police officers were not required to collect fingerprints or take photographs to corroborate the other evidence collected in this case. Because the government failed to present any evidence on this point, it was error for the trial court to instruct the jury that, as a matter of law, the government was under no such obligation. It similarly was error for the trial court to preclude defense counsel

---

**11.** It is axiomatic that an instruction is not warranted without some evidence to support it. *See generally Simms v. United States,* 867 A.2d 200, 204 (D.C.2005); *Hernandez v. United States,* 853 A.2d 202, 205 (D.C.2004).

It is well settled that the Due Process obligation to preserve and disclose exculpatory evidence does not impose on the government an affirmative duty to collect fingerprint evidence. *See, e.g., Williams v. United States,* 237 A.2d 539, 541 (D.C.1968) (government has no constitutional "affirmative duty" to test for fingerprints); *United States v. Butler,* 163 U.S.App. D.C. 1, 2–3, 499 F.2d 1006,

1007–8 (1974) (holding that due process duty of preservation does not imply a duty to create scientific evidence by performing tests of physical evidence already seized); *United States v. Weisz,* 231 U.S.App. D.C. 1, 23–5, 718 F.2d 413, 435–37 (1983) (FBI agents are not constitutionally required to record allegedly exculpatory conversations with defendant). Appellant argues, however, that police regulations, practices or procedures could have given rise to such an obligation as part of the investigation, and that it was the government's burden to establish otherwise.

from pointing out to the jury during closing argument that the government had not presented evidence to support that it had no duty to collect fingerprints.

■ Having determined the trial court erred, we must now decide whether that error was harmless or whether it amounted to grounds for reversal. *See Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). In order to affirm, "we must conclude after reviewing the weight of the evidence of guilt, as well as the nature of the error[ ], that the judgment of guilt was not substantially affected by the error[ ]." *McFerguson v. United States,* 870 A.2d 1199, 1205 (D.C.2005).

Upon a review of the record, we are satisfied that the trial court's error in delivering the "no duty" instruction was harmless. The court's instruction did not undermine the defense because defense counsel was able to argue that the lack of corroborative evidence weakened the government's case. In this way, this case is distinguishable from *Greer* where we found the error was not harmless. *See Greer,* 697 A.2d at 1211 (stating that "counsel was unable to argue to the jury that the lack of physical evidence and the failure of the police to pursue available means of recording the drug transaction might have created a reasonable doubt about her client's guilt."). Moreover, here, the government did not compound the error by suggesting in closing argument that it had no duty to collect corroborative evidence. Finally, the government's case against Brown was strong, as discussed more fully in the next section. Taking all these factors as a whole, we cannot say that the judgment of guilt was substantially swayed by the trial court's error in delivering the "no duty" instruction in this case.

### 3. The "No Duty" Instruction Combined with the Other Instructions

■ Brown argues that the "no duty" instruction given in this case, when combined with the trial court's instruction that the jury should base its decision "solely on the evidence presented at the trial" and the trial court's failure to tell the jury that reasonable doubt could be based on a "lack of evidence," led the jury to disregard the lack of corroborative evidence and to convict him improperly. Reviewing this claim for plain error, we may reverse only if we find an error that is "obvious or readily apparent, and clear under current law," and "so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial." *Jones v. United States,* 813 A.2d 220, 223–24 (D.C.2002) (citation and internal quotation marks omitted).

■ In addition to the trial court's error in giving the "no duty" instruction, we find that the trial court made a clear and obvious error when it failed to read the revised reasonable doubt instruction adopted by this court in *Smith v. United States,* 709 A.2d at 82. There, we said "in the strongest terms, that the trial court should resist the temptation to stray from, or embellish upon" our revised reasonable doubt instruction. *Id.* at 83 (citation and internal quotation marks omitted). In the instant case, the trial court erred by reading an outdated version of the reasonable doubt instruction that failed to inform the jury, as required by *Smith,* that it could find a reasonable doubt based on a *lack* of evidence. Because the trial court "deviate[d] from an approved, constitutionally sound reasonable doubt instruction, our inquiry is whether there has been a misdescription of the burden of proof, producing a reasonable likelihood that the jury understood the instructions to allow conviction based on a lesser standard than proof

beyond a reasonable doubt." *Butler v. United States,* 646 A.2d 331, 334 (D.C. 1994) (citations and internal quotation marks omitted).

 Although the trial court's failure to read the *Smith* reasonable doubt instruction was erroneous, we do not conclude that the reasonable doubt instruction given by the trial court was constitutionally deficient. The instruction given by the trial court was a former version of the Redbook jury instruction on reasonable doubt. Even though we replaced that instruction in *Smith* because we were "persuaded that the approval of a uniform, modified reasonable doubt instruction [was] appropriate," *Smith,* 709 A.2d at 81, we recognized that the former Redbook instruction, "although arguably not ideal, [ ] has withstood over time various constitutional challenges." *Id.* at 80. That instruction had been "used in this jurisdiction for decades and approved repeatedly, not only by this court but by the D.C. Circuit as well." *Id.* (citing generally, *Butler,* 646 A.2d at 337; *Foreman v. United States,* 633 A.2d 792, 794 (D.C.1993); *Baptist v. United States,* 466 A.2d 452, 459 (D.C.1983); *Moore v. United States,* 120 U.S.App. D.C. 203, 204 & n. 4, 345 F.2d 97, 98 & n. 4 (1965)). In fact, in *Laughlin v. United States,* 128 U.S.App. D.C. 27, 385 F.2d 287 (1967), a decision binding upon this court under *M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C.1971), the D.C. Circuit rejected the very argument made here, that the trial court erred by failing to inform the jury that "reasonable doubt might arise from lack of evidence." *Laughlin,* 128 U.S.App. D.C. at 34–35, 385 F.2d at 294–95. The *Laughlin* court explained that "in a case where some lack of evidence for the government fairly creates a reasonable doubt of guilt, we may expect a normally intelligent jury to perceive that fact after comparison and consideration of

all the evidence." *Laughlin,* 128 U.S.App. D.C. at 35, 385 F.2d at 295 (citation omitted). Although *Smith* now requires the court to inform the jury that a reasonable doubt may arise from a lack of evidence, *Laughlin* recognized that a trial court's failure to do so is not per se prejudicial. In this respect, it is important to note that the *Smith* instruction was adopted "prospectively only." *Smith,* 709 A.2d at 83. Had the court in *Smith* concluded that the former instruction might lead the jury to convict based on a lesser standard than "proof beyond a reasonable doubt," there is little doubt that the ruling would have been applied retroactively as well as prospectively.

 Although we find that the pre-*Smith* reasonable doubt instruction is not by itself constitutionally deficient, we must also consider whether, viewed in context, the instruction constituted "plain error" and "affected substantial rights." *Beaner v. United States,* 845 A.2d 525, 539 (D.C. 2004) (internal quotation marks omitted). If so, then we must consider whether the error resulted in a "miscarriage of justice" or "seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Id.* (internal quotation marks omitted). To this end, we must examine the trial as a whole, considering all of the evidence that was presented to the jury, all of the arguments that were made in closing, and any other instructions that may have shaped the jury's determination of Brown's guilt. Brown's primary concern is that the three challenged instructions, when read together, conveyed a message to the jury that it was not to consider any lack of corroborative evidence in rendering its verdict.

 It is well-settled that a reasonable doubt may arise " 'from the evidence, or from a lack of evidence, after consideration of all the evidence.' " *Greer,* 697

A.2d at 1211 (quoting *Bishop*, 71 App. D.C. at 138, 107 F.2d at 303). Accordingly, a defendant may properly cross-examine government witnesses about a lack of corroborative evidence and argue in closing that the absence of such evidence weakens the government's case. *See Hughes v. United States*, 633 A.2d 851, 852 (D.C. 1993). In *Greer*, we held that a trial court violated these principles by instructing the jury that it could not base its decision "on evidence that has not been presented." *Greer*, 697 A.2d at 1211. Greer's defense attorney had tried, during cross-examination, to elicit testimony from a police witness regarding steps the officers could have taken, but chose not to take, in order to collect corroborative evidence. *Id.* at 1209. The trial court curtailed this line of questioning on the ground that "such evidence would imply that the police are under some legal obligation to perform this task in certain ways." *Id.* When Greer's defense attorney brought the lack of corroborative evidence to the jury's attention during her closing argument, the trial court, *sua sponte*, interrupted her and told the jury that it "should base its decision based on the evidence which has been presented, and not on evidence that has not been presented." *Id.* at 1210. Viewing the record as a whole, the panel in *Greer* determined that "the court's curtailment of cross-examination was ... the principal factor" in its decision that the instructional error was not harmless. *Id.* at 1212.

Brown argues that the trial court made a similar error in this case by instructing the jury that it must base its decision "solely on the evidence presented at the trial" and that the government was under "no duty" to present corroborative evidence. Regardless of whether we deem these instructions to be the functional equivalent of the erroneous instruction given in *Greer*, we are unconvinced that the combination of instructions prejudiced Brown in any way. It is significant that the "principal factor" underlying the *Greer* court's finding of prejudice is absent from the instant case. Here, the trial court did not prevent Brown from cross-examining the police witnesses regarding their failure to obtain corroborative evidence. Brown's attorney thoroughly questioned Detective White regarding the officers' decision to use an unrecorded channel for broadcast communications during the observation post operation. Brown's attorney also cross-examined the detective about the officers' decision not to take any photographs during or after the observed drug transactions. In addition, Brown's attorney was permitted to argue, without interruption from the court, that the lack of corroborative physical evidence weakened the government's case. When the attorney in *Greer* attempted to make a similar argument, the trial court intervened and specifically told the jury that it was not to consider any lack of evidence in determining the defendant's guilt or innocence. Unlike the *Greer* jury, the jury in the instant case heard *evidence*, in the form of Officer White's testimony, that the officers could have, but chose not, to obtain any physical corroboration. As a result, the court's instruction that the jury should consider "solely ... the evidence presented at the trial" was harmless, because the "evidence presented at the trial" necessarily included the testimony about the absence of corroborative proof.

In any event, there is nothing in the record to suggest that the jury was actually misled by the combination of jury instructions. There are no notes from the jury indicating that the jurors were confused in any way. Although Brown claims that the government's case against him was "marginal," and argues that the jury would not have convicted him on such

weak evidence had it not been confused by the combination of instructions, Brown's characterization of the strength of the government's case is less generous than the record appears to support. The government presented two eyewitnesses who identified Brown in court as being the individual they had seen dealing drugs on October 5, 1999. Both officers gave nearly identical accounts of four drug transactions that had taken place that morning. Officer White found a stash of drugs at the very location he had seen Brown place a "small package." Additionally, drugs were found on both of the men who were arrested after the officers witnessed them transacting with Brown and Ferrell. Finally, Detective Kapetanakos' testimony, if believed, directly refuted the defense theory that the two officers had "let[ ] the seller and lookout vanish into the rush hour crowd" and arrested the wrong man. Detective Kapetanakos testified that he personally directed the arresting officers right to the spot where Brown and Ferrell were standing when they were arrested.

In sum, although we find that the trial court erred when it failed to tell the jury that it could find a reasonable doubt based on a lack of evidence, in accordance with our decision in *Smith v. United States,* 709 A.2d at 78, we hold that the error did not lead to a miscarriage of justice warranting a reversal of Brown's conviction.[12] *See Beaner,* 845 A.2d at 539 (reversal under plain error standard requires showing of plain error that affects substantial rights, but also requires either a showing of miscarriage of justice or a showing that error

affected the fairness, integrity or public reputation of proceedings).

### B. Kapetanakos' Notes and Prior Testimony

During his direct examination of Detective Kapetanakos, the prosecutor sought to admit notes that the Detective had taken immediately prior to witnessing the drug transactions on October 5, 1999. These notes contained Detective Kapetanakos' description of the clothing worn by the seller,[13] which the prosecutor argued could be admitted under the prior identification exception to the hearsay rule. Although Brown objected, arguing that they were inadmissible prior consistent statements, the trial court·permitted Detective Kapetanakos to testify about the contents of the notes, and the notes themselves were also admitted. During the detective's cross-examination, Brown challenged the detective's identification of him as the person he saw wearing the green jacket, blue jeans, and black-and-white-FUBU hat. Afterward, the prosecutor asked the court to admit portions of the detective's prior sworn testimony from a preliminary hearing and a motions hearing as prior consistent statements to show that the detective had repeatedly made the same identification. Brown argued that because he had not impeached the detective's description, the sworn statements could not be admitted as prior consistent statements. Although the trial court initially appeared to agree, the transcripts containing these statements were also admitted.[14]

---

12. In addition, because the reasonable doubt instruction given by the court was not constitutionally deficient, we find no structural error warranting per se reversal under *Sullivan v. Louisiana,* 508 U.S. 275, 279–80, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993).

13. The description indicated that the seller was wearing a "green jacket, black and white FUBU hat and blue jeans."

14. The contents of Detective Kapetanakos' preliminary hearing testimony which were read into the record contained the following descriptions: "the person walking with Mr. Ferrell" had been wearing a "green jacket,

During his closing argument, the prosecutor referred to Detective Kapetanakos' notes as a "critical" piece of "corroboration." The prosecutor focused on the consistency with which the detective had mentioned the black-and-white FUBU hat, both in his notes, and in his testimony at the two hearings. Brown's attorney, too, mentioned the detective's prior statements in her closing argument. Thereafter, the trial court gave the standard Redbook instruction regarding prior consistent statements. *See* CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 1.11 (4th ed.1996). In pertinent part, the court instructed the jury that, "[i]f you find that the earlier statement is consistent with the witness's present testimony in court you may consider this consistency both in judging the credibility of the witness here at trial, and as proof that what was said in the earlier statement was true."

 On appeal, Brown claims that the trial court erred in admitting Detective Kapetanakos' notes and sworn testimony because they were "prior consistent statements" that improperly bolstered the detective's credibility and did not serve to rebut a claim of recent fabrication. Determining whether a statement falls within an exception to the hearsay rule presents a question of law that this court considers *de novo*. *Brown v. United States*, 840 A.2d 82, 88 (D.C.2004). In general, we have said that "prior consistent statements may not be used to bolster an unimpeached witness." *Daye v. United States*, 733 A.2d 321, 325 (D.C.1999). Such statements are generally inadmissible because " 'mere

repetition does not imply veracity and . . . once an inconsistency in statement is shown, evidence of additional consistent statements does not remove the inconsistencies.' " *Warren v. United States*, 436 A.2d 821, 836 (D.C.1981) (quoting *Scott v. United States*, 412 A.2d 364, 373 (D.C. 1980)). There are, however, a number of exceptions to this rule. *Id.* Prior consistent statements may be used in rebuttal to "overcome a charge of recent fabrication by the witness." *Daye*, 733 A.2d at 325 (citations and quotation marks omitted). Moreover, hearsay statements may be otherwise admissible as "spontaneous utterance[s]" or "prior description testimony." *See Warren*, 436 A.2d at 836–37.

In the case before us, Brown never impeached Detective Kapetanakos' in-court testimony that the seller was wearing a green jacket, black-and-white FUBU hat, and blue jeans. Instead, Brown argued that, because he was not wearing a FUBU hat in photographs taken at the police station immediately following his arrest, he could not have been the man whom the detective had witnessed selling drugs. Defense counsel argued that appellant also did not resemble the description because he had a full beard and mustache. Therefore, we agree that Detective Kapetanakos' notes and transcript testimony were not admissible under the "prior consistent statement" exception to the hearsay rule to rebut a charge of recent fabrication.

 Nevertheless, because Detective Kapetanakos' notes and transcript testimony consisted entirely of descriptions of

black and white FUBU hat and blue jeans." "[T]here were two people involved, Mr. Ferrell and Mr. Brown. . . . Mr. Brown didn't change his clothes at any time during this incident. The whole time he had the green jacket, the black and white FUBU hat and blue jeans and he is the same person that went and picked up the stash." Detective

Kapetanakos' motions hearing testimony reiterated that prior to observing any drug sales, he had broadcast a lookout describing an individual "wearing a green jacket, a black and white FUBU hat and blue jeans." The testimony indicated that he had written in his notes an identical description of the person he had identified as Mr. Brown.

the seller, they *were* admissible under the "prior identification" exception to the hearsay rule. *See, e.g., Brown,* 840 A.2d at 88–89; *Warren,* 436 A.2d at 837; *Morris v. United States,* 398 A.2d 333, 338 (D.C. 1978). Under the prior identification exception, out-of-court descriptions or identifications are admissible as long as the identifying witness is available for cross-examination and the statements do not constitute a "detailed account[ ] of the actual crime." *Brown,* 840 A.2d at 89; *see also* D.C.Code § 14–102(b)(3) (2001). We admit such statements because " 'the earlier identification has greater probative value than an identification made in the courtroom after the suggestions of others and the circumstances of the trial may have intervened to create a fancied recognition in the witness' mind.' " *Brown,* 840 A.2d at 88–9 (quoting *Morris,* 398 A.2d at 337). Although Brown argues that it was improper to use the consistency of Kapetanakos' descriptions to bolster his in-court testimony in the absence of a prior attack on that testimony, we see nothing inherently wrong with using prior statements of identification in this way. As this court observed in *Morris,* " '[U]nlike other testimony that cannot be corroborated by proof of prior consistent statements unless it is first impeached . . . evidence of an extrajudicial identification is admitted *regardless of whether the testimonial identification is impeached* . . . .' " *Morris,* 398 A.2d at 337 (quoting *Gilbert v. California,* 388 U.S. 263, 272–73, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967)) (emphasis added). Accordingly, in *Warren,* we said that "prior description testimony" constituted a specific exception to the rule that prior consistent statements are inadmissible. *See Warren,* 436 A.2d at 836–37. Therefore, the trial court did not

err in admitting Detective Kapetanakos' notes and transcript testimony at trial where the detective was available for cross-examination and the prior statements did not provide a "detailed account[ ] of the actual crime," *Brown,* 840 A.2d at 89.[15]

For all of the foregoing reasons, Brown's convictions are

*Affirmed.*

---

**15.** Finding no error in the trial court's admission of this prior identification testimony, we are unpersuaded by Brown's final argument that the admission of this testimony, when combined with the court's reading of the "no duty" instruction and its failure to read the *Smith* reasonable doubt instruction was prejudicial error.